UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION AT TOLEDO

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VAN HAM DAIRY, LLC, | ) | Case No. 10-33231 |
| | ) | |
| Debtor. | ) | Hon. Richard L. Speer |

## VAN HAM DAIRY, LLC'S DISCLOSURE STATEMENT

**Counsel for the Van Ham Dairy, LLC:**

John R. Burns (Ohio Bar #0003349)
111 East Wayne Street, Suite 800
Fort Wayne, IN 46802
Telephone: (260) 424-8000
Facsimile: (260) 460-1700
john.burns@bakerd.com

Terry E. Hall (Indiana Bar #22041-49)
300 N. Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone: (317) 237-0300
Facsimile: (317) 237-1000
terry.hall@bakerd.com

BDDB01 6324850v2

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     BACKGROUND OF DAIRY ..................................................................................... 2

III.    THE DAIRY CHAPTER 11 CASE ........................................................................... 8

IV.     WHO MAY FILE A PLAN ...................................................................................... 10

V.      SUMMARY OF THE PLAN .................................................................................... 10

    A.    PURPOSE OF THE PLAN ....................................................................................................10
    B.    ADMINISTRATIVE CLAIMS ...............................................................................................10
    C.    CLASSIFICATION AND TREATMENT OF THE CLAIMS AND EQUITY INTERESTS ...................11
    D.    MEANS FOR FUNDING AND IMPLEMENTING THE PLAN .....................................................12
    E.    DISTRIBUTION OF PROPERTY AND ADMINISTRATION OF THE PLAN ...................................12
    F.    EXECUTORY CONTRACTS..................................................................................................14
    G.    MANAGEMENT OF THE REORGANIZED DAIRY ..................................................................15
    H.    OBJECTIONS TO CLAIMS ..................................................................................................15
    I.    PROVISIONS OF CLASSES WHICH ARE IMPAIRED AND DO NOT ACCEPT THE PLAN..............15
    J.    RESERVATION OF JURISDICTION BY THE BANKRUPTCY COURT .........................................16
    K.    AMENDMENT, MODIFICATION OR REVOCATION OF THE PLAN. ........................................16
    L.    DISCHARGE OF DAIRY ......................................................................................................16

VI.     LIQUIDATION ANALYSIS ..................................................................................... 17

VII.    CONFIRMATION OF THE PLAN .......................................................................... 17

    A.    ACCEPTANCE OF THE PLAN..............................................................................................17
    B.    VOTING CLAIMS SUBJECT TO A PENDING OBJECTION .......................................................18
    C.    NO UNFAIR DISCRIMINATION/FAIR AND EQUITABLE TEST ..............................................18
    D.    BEST INTERESTS ..............................................................................................................19
    E.    FEASIBILITY ....................................................................................................................20

VIII.   TAX CONSEQUENCES OF THE PLAN ................................................................ 21

IX.     CONCLUSION .......................................................................................................... 21

BDDB01 6324850v2

THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF OHIO, TOLEDO DIVISION (THE "BANKRUPTCY COURT"), HAS APPROVED THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT").  HOWEVER, THE BANKRUPTCY COURT'S APPROVAL DOES NOT CONSTITUTE A DETERMINATION OF THE MERITS OF THE ACCOMPANYING CHAPTER 11 PLAN (THE "PLAN").  THE BANKRUPTCY COURT HAS DETERMINED THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO ENABLE CREDITORS OF VAN HAM DAIRY, LLC, AS DEBTOR AND DEBTOR-IN-POSSESSION ("DAIRY"), TO MAKE AN INFORMED JUDGMENT IN EXERCISING RIGHTS TO VOTE UPON THE PLAN.

ONLY THIS DISCLOSURE STATEMENT IS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES FOR THE ACCEPTANCE OR REJECTION OF THE PLAN.  NO REPRESENTATION CONCERNING DAIRY, ITS BUSINESS OPERATIONS, OR THE VALUES OF ITS ASSETS IS AUTHORIZED BY THE BANKRUPTCY COURT, EXCEPT AS EXPLICITLY SET FORTH HEREIN OR IN ANY OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSIONER OF THE STATE OF OHIO OR ANY OTHER STATE OR COMMONWEALTH.  THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED HEREIN EXCEPT AS EXPRESSLY INDICATED HEREIN.  THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY DAIRY FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF DAIRY'S KNOWLEDGE, INFORMATION AND BELIEF.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN.  ALL CREDITORS AND OTHER INTERESTED PARTIES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.

# I.       INTRODUCTION

Pursuant to § 1125 of the Bankruptcy Code, Dairy hereby provides this

Disclosure Statement to known creditors to disclose information deemed by Dairy to be material,

important, and necessary for creditors to arrive at a reasonably informed decision in exercising

their rights to vote for acceptance of the Plan.  A copy of the Plan accompanies this Disclosure

Statement.  All capitalized terms used herein that are defined in Article I of the Plan shall have

the meanings ascribed by the Plan unless the context in which such terms are used herein clearly

dictate a different meaning.

**THIS DISCLOSURE STATEMENT AND THE PLAN ARE AN
INTEGRATED PACKAGE AND BOTH SHOULD BE CONSIDERED TO PROVIDE
ADEQUATE INFORMATION.**

**The Bankruptcy Court has scheduled a hearing on acceptance of the Plan for
_____ __, 2010 at ____ _.m. Eastern Standard Time in Courtroom No. 1, Room 119,
United States Courthouse, 1716 Spielbusch Avenue, Toledo, Ohio.  Creditors may vote on
the Plan by filling out and mailing the accompanying ballot at a time and in a manner to
cause the completed ballot to be actually received by counsel for Dairy on or before
_____ __, 2010.  As a creditor, your acceptance is important.**

**NO REPRESENTATIONS CONCERNING DAIRY (PARTICULARLY AS
TO ITS FUTURE BUSINESS OPERATIONS OR VALUE OF PROPERTY) ARE
AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.
ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR
ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE
STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR
DECISION, AND CIRCUMSTANCES REGARDING ADDITIONAL**

**REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO DEBTOR'S COUNSEL, WHO WILL INFORM THE BANKRUPTCY COURT.**

## II.     BACKGROUND OF DAIRY

Jan and Anja van Ham (the "van Hams") were successful owners of a family run commercial dairy farm in the Netherlands prior to immigrating to the United States in 2001 to open, own and operate a domestic commercial dairy facility with a capacity of 650 cows sited on 160 acres ("Original Dairy"). The van Hams were the sole owners of the Original Dairy and the Original Dairy was financed by Standard Federal Bank. In 2006, the van Hams decided to expand their existing operations from 650 to 2200 cows. Vreba-Hoff Dairy Development, LLC ("Dairy Development"), a company that develops commercial dairy operations, approached the van Hams to assist them in their expansion under a loan program Dairy Development had established with AgStar Financial Services, PCA ("AgStar PCA") and AgStar Financial Services, FLCA ("AgStar FLCA" and together with "AgStar PCA" may be collectively referred to as "AgStar") for the development and expansion of commercial dairy operations in the United States.

AgStar PCA and AgStar FLCA are federally chartered agricultural lending institutions, cooperatively owned by stockholders, under the Farm Credit Act, 12 U.S.C. §§ 2001-2279cc (as amended from time to time).[1] AgStar PCA, as a production credit association, primarily makes loans to finance agricultural operations and equipment. AgStar FLCA, as a federal land credit association, primarily makes loans to finance the purchase of agricultural land. The borrower/lender relationship between Dairy Development and AgStar FLCA included a certain "Program Guaranty" dated as of May 5, 2006 under which Dairy Development deposited $5 million with AgStar FLCA to secure payments to AgStar FLCA on

---

[1]  AgStar PCA and AgStar FLCA are believed to be wholly owned subsidiaries of AgStar ACA.

borrowings of operation companies being developed by Dairy Development ("Program Loan Guaranty").

The transaction among the van Hams, Dairy Development, and AgStar included the transfer of the Original Dairy and improvements ("Real Property") to a new company organized by Dairy Development, Van Ham Dairy Leasing, LLC ("Leasing"), with the operations remaining in the original Dairy. Simultaneous with the transfer of the Real Property, Dairy entered into a triple net lease dated as of November 26, 2006 ("Lease") of the Real Property with Leasing. The Lease payment in effect during the construction of the expansion until the expansion was substantially completed was to be an amount invoiced by Leasing and intended to be the amount of the monthly principal and interest payments due Leasing's secured lender plus administrative expenses and an investment return to Leasing. Once the expansion was substantially complete, the rent payment was to be determined in good faith between Leasing and Dairy considering the fair market value of the Real Property after the expansion, the costs and terms of Leasing's financing of the expansion and other factors deemed relevant by Leasing. Dairy is also responsible for the amounts necessary to pay all costs of insurance, taxes, and maintenance of the Real Property ("Costs"). The Costs under the Lease were and are being paid directly by Dairy.

AgStar FLCA financed Leasing's construction of the improvements to and expansion of the Original Dairy under two notes, one dated as of November 28, 2006 in the amount of $7.6 million ("First FLCA Note") and a second dated as of June 6, 2007 in the amount of $330,000 ("Second FLCA Note" and, together with the First FLCA Note, may be referred to herein as the "FLCA Notes"). The First FLCA Note was to mature in November 2024 and required interest only payments. The Second FLCA Note was to mature in June 2027 and

required interest and principal payments. Leasing delivered two mortgages on the Real Property to AgStar FLCA to secure the FLCA Notes. AgStar FLCA also filed UCC-1 financing statements against the property of Leasing pursuant to a security agreement between Leasing and AgStar FLCA related to a mobile home trailer. AgStar asserts that the FLCA Notes are in default and the amounts due and owing under the First FLCA Note and the Second FLCA Note as of October 31, 2009 were $7,695,037.76 and $319,509.10, respectively, and that the FLCA Notes continue to accrue default interest, fees and costs, and late charges.

AgStar PCA financed the expansion of the operations of the Original Dairy under two notes, the second dated as of August 7, 2008 in the original principal amount of $3,340,000.00 ("Second PCA Note") and the first dated as of November 26, 2006 in the original principal amount of $370,000.00 ("First PCA Note"). The Second PCA Note was an interest only payment note with payments beginning in September 2008 and maturing in August 2009. The Second PCA Note was executed by Dairy Development, Ohio Dairy Holdings, LLC ("Ohio Dairy"), Leasing and individually by the van Hams. The First PCA Note was originally executed by Dairy and the van Hams individually as were a series of short term loan extensions extending the maturity date of the First PCA Note from its original December 2007 maturity date through August 1, 2008. In August 2008, the First PCA Note was renewed and Dairy Development and Ohio Dairy were added as borrowers ("Renewed First PCA Note" and, together with the Second PCA Note, the "PCA Notes"). The Renewed First PCA Note matured on August 1, 2009 and was thereafter not renewed. The PCA Notes are secured under a Security Agreement dated as of November 28, 2006 and a UCC-1 financing statement recorded on December 7, 2006. AgStar PCA asserts the balances due and owing as of March 29, 2010 on the Second PCA Note and the Renewed First PCA Note were $3,461,829.88 and $79,578.00, respectively, and accruing interest

BDDB01 6324850v2

at default rates plus fees and charges pursuant to their terms.  In November 2006, Leasing, and the van Hams delivered an "acknowledgement" of the Program Loan Guaranty to AgStar PCA making them eligible as a "Program Participant" under the Program Loan Guaranty agreement.

As a condition to making the loans and as a Program Participant under the Program Loan Guaranty agreement, AgStar PCA required Dairy Development to make a $1,373,742 cash investment in Dairy ("Dairy Development Investment").  Dairy Development did not make that investment in cash but instead sold 1,570 cows ("Expansion Cows") to Dairy at a price of $2,500[2] per cow with a sufficient amount of the value of the cows being applied to the Dairy Development Investment and the balance of the purchase price being paid to Dairy Development by Dairy drawing down $2,225,000 on the Second PCA Note.  As a further condition, AgStar PCA required Dairy to use the consulting and monitoring services of Dairy Development.

The expansion was expected to be completed within five to six months, but due to factors beyond the control of Dairy, the expansion took close to two years to complete.  During that time, Dairy made payments to Leasing under the Lease of varying amounts.  The expansion was substantially completed and the cow purchase described above took place in or about February 2008.  Following the completion of the expansion, Dairy paid monthly rent to Leasing in the amounts determined by Leasing under the Lease.

In 2007, milk prices were high and Dairy was able to pay its debts, make its rent payments to Leasing, and fund its operations.  This continued into 2008 until milk prices began an unexplained and accelerating decline late in 2008.  By the middle of 2009, milk prices were at all time lows and nearly every commercial dairy farm in the United States was in deep financial trouble.  Unfortunately, many of the Expansion Cows were older, in late lactation and not

---

[2] The market value for similar age and quality cows was about $1600 at that time.

pregnant; therefore, the milk production of Dairy was significantly less than what would have been expected. Further, the Expansion Cows needed to be culled at a higher than normal rate resulting in higher than normal replacement costs to Dairy. To add to the difficulties of the dairy industry and Dairy, commodity prices reached high levels and feed expenses rose precipitously. The combination of lower than expected milk production, crashing milk prices, and soaring feed prices resulted in severe cash constraints on Dairy.

In August 2009, AgStar sent notices of default on both the AgStar PCA Notes and the AgStar FLCA Notes to Dairy and Leasing. On November 24, 2009, AgStar FLCA filed a complaint for foreclosure, replevin and other relief against Leasing ("Leasing Complaint") in the United States District Court for the Northern District of Ohio, Western Division (the "Leasing District Court Case"). Dairy was named as a defendant in the Leasing District Court Case solely to assert any interest that Dairy may have in the Real Property.

Following the filing of the Leasing Complaint, Dairy continued to make its interest payments on the PCA Notes and, at the direction of AgStar, began submitting its payments under the Lease directly to AgStar. Dairy began searching for alternative financing sources, but credit was essentially non-existent for dairy operations during 2009 and the first half of 2010. While searching for financing, Dairy was able to use its good name, its history of paying its bills, and its long history in the community to purchase on unsecured credit 300 fresh heifer cows[3] from one of its long time vendors in the first quarter of 2010 and culled some of the most unproductive Expansion Cows. Dairy saw the purchase of the 300 fresh heifers as essential to turning around its declining profits. Once the new cows became became fully productive,

---

[3] A fresh heifer is a cow that has just born its first calf. Afresh heifer will come into its highest milk production three months after calving.

BDDB01 6324850v2

Dairy's income increased and it began to catch up its payments to suppliers and stayed in negotiation with AgStar to restructure its debts and continue in business.

As forecasted, Dairy generated small operating profits from November 2009 through March 2010.[4] In February 2010, Dairy's newly purchased cows began to get fully acclimated to their new surroundings, and Dairy recorded an operating profit of $84,266.63.

On March 29, 2010, AgStar initiated a separate complaint against Dairy ("Dairy Complaint") in the United States District Court for the Northern District of Ohio (the "Dairy District Court Case"), and sought the appointment of a receiver on an emergency basis (the "Receivership Motion") in both the Leasing District Court Case and the Dairy District Court Case. The next day, on March 30, 2010, the District Court entered an Order Appointing Receiver over the property of Leasing in the Leasing District Court Case and over the property of Dairy in the Dairy District Court Case (the "Receivership Orders"). The Receivership Orders appointing the receiver, Roach & Associates, LLC ("RA"), became effective on April 5, 2010 upon the filing of an oath by RA. RA was not required to post a bond. Dairy has appealed the order appointing RA and a companion order of possession entered by the District Court over the property of Dairy. That appeal remains pending.

On May 10, 2010 Dairy filed its chapter 11 case to reorganize its debt and business and continue as a valuable contributor to the local economy of northeastern Ohio.

On September 3, 2010, Leasing filed its chapter 11 case to reorganize with the Dairy and continue in business as a valuable contributor to the local economy of northeastern Ohio.

---

[4] The operating profits recorded by Dairy have been contested by AgStar who challenges the accounting system used by Dairy's accounting firm. RA took control of the books and records of Dairy prior to Dairy being able to complete in March 2010 and quarter end books. However, Dairy believes that its records, when fully reconstructed will show that Dairy recorded an operating profit from November 2009 through March 2010.

BDDB01 6324850v2

## III.     THE DAIRY CHAPTER 11 CASE

The appointment of RA complicated the initial days of the Dairy Chapter 11 Case. Upon the filing of the Dairy Chapter 11 Case and the entry of the order for relief, all property of Dairy came under the jurisdiction of the Bankruptcy Court. The Dairy filed "First Day" motions to smooth its operations into chapter 11 seeking, among other things, to use its cash, continue use of its existing banking relationships, pay its employees, taxes, and insurance and employ professionals to assist it during the Dairy Chapter 11 Case. AgStar resisted the removal of RA and filed pleadings seeking to excuse RA's duty to comply with the Bankruptcy Code to return possession and control of Dairy's property to Dairy and asking the Bankruptcy Court to decline jurisdiction over the Dairy Chapter 11 Case. Dairy objected to these motions and prior to the hearing set to resolve the disputes, AgStar and Dairy reached an interim agreement and submitted a stipulated order (the "Stipulated Order") which was signed by the Bankruptcy Court on June 2, 2010 and entered on the docket on June 5, 2010. (Docket No. 118). Under the Stipulated Order and during the time period expiring on the 90th day following entry of the Stipulated Order ("Interim Period"), RA, as an "excused custodian" and Dairy, as a debtor in possession, worked together under an agreed budget to run the Dairy's operations; however, RA retained final decision making authority. Pursuant to the Stipulated Order, the Interim Period could be briefly extended if, prior to its expiration, AgStar filed a motion to appoint a chapter 11 trustee or an examiner in the Dairy Chapter 11 Case. If that occurred, the Interim Period would then continue until two business days following the entry of an order disposing of any such motion. On August 25, 2010, AgStar filed a motion seeking the appointment of a chapter 11

BDDB01 6324850v2

trustee. That motion is pending as of the date of filing of the Disclosure Statement and Plan, and the hearing on the motion is set for September 13, 2010.[5]

In the Dairy Chapter 11 Case, Dairy continued its prepetition turnaround and further stabilized its business, entered into ordinary course of business contracts for feed, negotiated forage and corn silage contracts, remained current with its vendors, and increased per cow milk production to approximately 77 pounds per cow per day. Dairy took advantage of the advice and experience of RA and implemented changes to its operations that have increased efficiency and profitability. Those changes have been incorporated into the business and practices of Dairy and Dairy intends to continue those practices. In addition, Dairy has made changes to its employees' duties and functions. RA replaced the herdmaster and nutritionist of Dairy with its recommended personnel. Dairy is intending to seek permanent replacements of those two positions based upon recommendations and assistance from RA.

Dairy's total herd numbers are slightly less than on the Petition Date, but the improvement in the composition of the herd begun prior to the filing has continued as the less productive Expansion Cows have been culled and replaced with younger, more productive cows. Pursuant to the reports filed by RA (as the reporting body during the Interim Period), Dairy is operating on its cash production (though the purchase of additional cows is less than was projected), has made principal and interest payments on the debt Dairy owed to AgStar PCA and principal and interest payments on the debt Leasing owes to AgStar FLCA (as rent), and made payments to RA of over $200,000.00.[6] Dairy is current on its obligations to pay property taxes

---

[5]   As of the filing of this Disclosure Statement, that hearing date and the matters to be heard are being jointly requested to continue.

[6]   The monthly PCA payment totals $70,012.00 calculated as the principal and default interest payment on the Dairy's PCA Notes amortized over five (5) years at 5.5% APR. The rent payment is $45,869.00 calculated as the principal and interest payment Leasing owes to AgStar FLCA on the FLCA Notes at a default interest rate.

9

on the Leasing Real Property, has maintained all insurance and continues to enjoy the support of and ongoing business relationships with its prepetition vendors, contract parties, and community. Dairy expects continued profitable performance through the balance of the Chapter 11 Cases and after Confirmation of its Plan.

## IV.     WHO MAY FILE A PLAN

Dairy has the exclusive right to file a plan in the Dairy Chapter 11 Case through and including September 7, 2010.

## V.     SUMMARY OF THE PLAN

A copy of the Plan accompanies this Disclosure Statement.  The Plan should be referred to for details concerning the treatment and classification of creditors and interest holders.  The following summary is qualified in its entirety by the express provisions of the Plan.

### A.     Purpose of the Plan

The purpose of the Plan is to provide Dairy with an ownership structure and debt structure that can be supported by operations.  Dairy believes that the reorganization contemplated by the Plan is in the best interests of creditors as a whole.  If the Plan is not confirmed, Dairy believes that it will be forced to liquidate under chapter 7 of the Bankruptcy Code.  In that event, Dairy believes that no general unsecured creditor will be paid and its primary secured creditor, AgStar PCA, will realize substantial losses.

### B.     Administrative Claims

Administrative Claims representing costs incurred in the ordinary course of business and not yet paid will be paid by Dairy on the date such debt is due.[7]  Payments owed to the United States Trustee will be paid in the ordinary course when due.  Final payments to

---

[7] The Dairy entered into postpetition contracts for the purchase of corn silage from area growers and granted a purchase money security interest to the growers.  Those contracts will be honored and paid according to their terms.

BDDB01 6324850v2

Dairy's professionals will be paid within thirty (30) days of the date such applications for payment become final and are allowed by order of the Bankruptcy Court. Allowed Priority Claims for taxes will be paid in forty-eight equal monthly installments of principal, together with interest at the rate of three and one quarter percent (3.25%) per annum.

## C.    <u>Classification and Treatment of the Claims and Equity Interests</u>

### 1.    Summary

A summary of the treatment of the classified claims is as follows:

| Class/Type of Claim or Equity Interest | Estimated Allowed Claims Amount[8] | Treatment | Projected Recovery Under Plan | Impaired/ Unimpaired |
|---|---|---|---|---|
| Class 1: Allowed Secured Claim of AgStar PCA | $3,565,142 | AgStar PCA New Note, 7 years amortization (5 year maturity , non-recourse at 5.5% interest, liens retained | 100% | Impaired |
| Class 2: Allowed Secured Claim of CNH Capital | $22,174.23 | Non-recourse New Note at 0% interest payable in monthly installments and due in full on June 30, 2011 liens retained | 100 % | Impaired |
| Class 3: Allowed Other Secured Claims | $0 | To be determined by Dairy and Claimant | 100% | Impaired |
| Class 4: Allowed Other Priority Claims | $0 | To be determined by Dairy and Claimant | 100% | Impaired |
| Class 5: Allowed Unsecured Claims | $2,000,000 | Secured notes payable with a 10 year amortization and a five year maturity at 3.75% interest rate payable quarterly | 100% | Impaired |
| Class 6: Allowed Equity Interests | $0 | Equity will retain its interests | 100% | Deemed to accept; not entitled to vote |

---

[8] The estimated Allowed amount of a Secured Claim has not been adjusted for any adequate protection payments or other payments made by Dairy during the Chapter 11 Case and may be reduced accordingly. No unpaid postpetition interest will be paid on any secured claim.

11

### 2. Treatment of Claims and Equity Interests

The Allowed Secured Claim of AgStar PCA shall be valued at $3,565,143. The Allowed Secured Claim of AgStar PCA will be documented as a new non-recourse note amortized over 5 years at a fixed rate of interest of 5.5% with a continuing security interest granted in all assets of Dairy.

The Allowed Secured Claim of CNH Capital will be documented as a new note amortized over 1 year at a fixed rate of interest of 0% and payable in monthly installments. No prepetition late charges, default interest or postpetition interest shall be included in the Allowed Secured Claim of CNH Capital.

The Allowed Unsecured Claims shall be satisfied by delivery of new notes secured by a junior lien on all the assets of Dairy subject to nondisturbance provisions of the senior lien held by AgStar PCA and any valid purchase money security interests and any tax liens ("Permitted Liens"). The new notes shall be and will be the Allowed amount of the Claim and paid quarterly in principal and interest payments amortized over ten years at 3.75% interest, but maturing 60 months from the Effective Date of the Plan.

### D. Means For Funding and Implementing the Plan

The central method for implementing the Plan will be through the Merger of Reorganized Leasing into Reorganized Dairy as of the Effective Date and in the sequence of transactions provided for in the Plan. The Plan will be funded by the post-Merger operation of the Reorganized Dairy's business.

### E. Distribution of Property and Administration of the Plan

#### 1. Vesting of Property in Reorganized Dairy

Except as otherwise provided in the Plan and the Leasing Plan, all of the assets, properties and rights of Dairy owned by Dairy of every type and description, tangible, intangible,

BDDB01 6324850v2

wherever located, except for those funds to be paid by Dairy before the Effective Date, shall be transferred and automatically vested in Reorganized Dairy as of the Effective Date free and clear of all liens, claims, rights of setoff, security interests, pledges, encumbrances, adverse rights of interest, covenants, charges, debts and contractually imposed restrictions, and all such liens, claims, rights of setoff, security interests, pledges, encumbrances, adverse rights of interest, covenants, charges, debts and contractually imposed restrictions, except such liens as are expressly provided in the Plan. Moreover, all Causes of Action (under any theory of law or equity, including, without limitation, the Bankruptcy Code, and in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Dairy Chapter 11 Case but excluding Bankruptcy Causes of Action) of Dairy shall be transferred on the Effective Date to Reorganized Dairy. Reorganized Dairy shall then have the right to commence and pursue all Causes of Action. Upon information and belief, those Causes of Action consist primarily of rights to collect accounts receivable owing as of the Effective Date.

## 2.        Organizational Authorization

The entry of the order confirming the Plan shall constitute authorization for Dairy, Reorganized Dairy and/or Reorganized Leasing to take or cause to be taken all organizational action necessary and appropriate to consummate and implement the Plan and the Merger (including the adoption of a plan of merger and related documents to achieve and consummate the Merger and the amendment of Dairy's, Leasing's and Reorganized Leasing's articles of organization and operating agreements, as applicable) prior to and after the Effective Date and all such organizational actions taken or caused to be taken shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to applicable non-Bankruptcy law and the Bankruptcy Code, without any requirement of further action by Dairy, Reorganized Leasing or their members or managers. On or before the Effective Date, Dairy, Reorganized

13

Leasing and Reorganized Dairy shall be authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan.

F.     **Executory Contracts**

Except as otherwise provided in the Plan effective on and as of the Effective Date any and all Executory Contracts that exist between Dairy and any party which: (a) have not expired or terminated pursuant to their own terms; (b) have not previously been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date; (c) are not the subject of pending motions to assume, or assume and assign, or reject as of the Confirmation Date; (d) are not specified in the list of Executory Contracts to be assumed by Dairy pursuant to the Plan as set forth on <u>Exhibit C</u> attached thereto are hereby specifically rejected; *provided, however,* that Dairy shall have the right, at any time prior to the Effective Date, to: (y) amend <u>Exhibit C</u> to add or delete any Executory Contract listed therein, thus providing for its rejection or assumption pursuant to Article IV of the Plan. The Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute an order of the Bankruptcy Court: (a) approving such assumption as of the Effective Date pursuant to §§ 365 and 1123(b)(2) of the Bankruptcy Code; (b) extending the time, pursuant to § 365(d)(4) of the Bankruptcy Code, within which Dairy may assume, assume and assign, or reject such Executory Contracts through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such Executory Contract; and (c) approving, pursuant to §§ 365(a) and 1123(b)(2) of the Bankruptcy Code, the rejection of the Executory Contracts.

Reorganized Dairy will satisfy all undisputed cure amount and any other monetary default payments required by § 365(b)(1) of the Bankruptcy Code under any Executory Contract identified on <u>Exhibit C</u> to the Plan (as may be modified in accordance with § 4.1 of the Plan), to the extent any such Executory Contract is in default (and to the extent such obligations

14

are enforceable under the Bankruptcy Code and applicable non-bankruptcy law), or the counter-party to such Executory Contract has not waived any monetary amounts arising prior to the Petition Date, by the payment of such undisputed cure amounts as agreed to by Reorganized Dairy and the counterparty to the Executory Contract or as determined by Final Order of the Bankruptcy Court. Executory Contract cure obligations, if not previously determined by an order of the Bankruptcy Court prior to the Effective Date, may be paid without further order of the Bankruptcy Court if such cure amounts are agreed to by Reorganized Dairy and the counterparty to such Executory Contracts. To the extent Reorganized Dairy and the counterparty to an Executory Contract cannot agree as to a particular cure amount, then such amounts will be determined by the Bankruptcy Court after notice and a hearing.

G.      **Management of the Reorganized Dairy**

The manager of Dairy serving on the Confirmation Date will continue to serve in such capacity with Reorganized Dairy post-Merger pending further action by Reorganized Dairy's members in accordance with applicable non-Bankruptcy law.

H.      **Objections to Claims**

Dairy and/or Reorganized Dairy shall have the right to file objections to Claims through and including sixty (60) days following the Effective Date.

I.      **Provisions of Classes Which Are Impaired and Do Not Accept the Plan**

Under the Bankruptcy Code, Claims in Classes which are impaired are entitled to vote on the Plan, unless the Holder of such a Claim is an insider or such class shall not retain nor receive any property on account of its Prepetition Claim or Equity Interest. All Classes are impaired. Classes 1 through 5 may vote under the Plan.

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan notwithstanding the failure of an impaired Class to vote in favor of the Plan if the

BDDB01 6324850v2

Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Equity Interests that is impaired and has not accepted the Plan. Dairy intends to the extent necessary to ask the Bankruptcy Court to implement the provisions of Section 1129(b) to achieve confirmation of the Plan, in the event an impaired class fails to vote in favor of the Plan.

**J.      Reservation of Jurisdiction By the Bankruptcy Court**

The Plan provides that the Bankruptcy Court will retain jurisdiction over the Chapter 11 Cases after Confirmation for various purposes as detailed in Article XI of the Plan.

**K.      Amendment, Modification or Revocation of the Plan.**

Dairy reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, Reorganized Dairy may, upon notice, or hearing and an order of the Bankruptcy Court, amend or modify the Plan in accordance with § 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A Holder of a Claim or Equity Interest that is deemed to have accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder.

**L.      Discharge of Dairy**

Except as otherwise provided in § 1141(d), the Plan, or the Confirmation Order, as of the Effective Date, Confirmation of the Plan shall discharge Dairy from any debt that arose before the Effective Date and any debt of a kind specified in §§ 502(g), (h) or (i) of the Bankruptcy Code.

BDDB01 6324850v2

## VI.    LIQUIDATION ANALYSIS

Holders of Claims in impaired Classes will receive a distribution under the Plan greater than they would receive under a chapter 7 forced liquidation sale.  The initial distribution to Holders of Claims in impaired Classes on the Effective Date is greater than what would be received by such Holders of Claims in a chapter 7 forced liquidation.  That liquidation analysis will show that in a liquidation, no monies will be available to pay unsecured creditors and the return to secured creditors will be less than projected.  A liquidation analysis will be provided on or before the Disclosure Statement Exhibit Filing Date.

## VII.    CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of § 1129 of the Bankruptcy Code are met.  Among the requirements for Confirmation are that the Plan:  (1) is accepted by all impaired Classes of Claims or Equity Interests entitled to vote or, (2) if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class.

### A.    Acceptance of the Plan

The Bankruptcy Code defines acceptance of the Plan by a Class of creditors as acceptance by creditors holding two-thirds (2/3) in dollar amount and a majority in number of the Claims in such Class (other than any such creditor designated under § 1126(e) of the Bankruptcy Code), but for this purpose only counts those creditors that actually cast ballots. Holders of Claims or Equity Interests that fail to vote are not counted as either accepting or rejecting the Plan.

BDDB01 6324850v2

**B.** **Voting Claims Subject to a Pending Objection**

If Dairy has objected to the Claim of a creditor, the Holder of such Disputed Claim is not entitled to vote on the Plan absent further order of the Bankruptcy Court resolving the objection or estimating the claim for purposes of voting.

**C.** **No Unfair Discrimination/Fair and Equitable Test**

In the event that any impaired Class does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of Dairy if, as to each impaired Class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."

A plan under chapter 11 of the Bankruptcy Code "does not discriminate unfairly," within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Equity Interests receives more than it is legally entitled to receive for its Claims or Equity Interests.

Under the Bankruptcy Code, "fair and equitable" has different meanings for secured and unsecured claims. With respect to a secured claim, "fair and equitable" means: (1) the impaired secured creditor retains its liens to the extent of its Allowed Secured Claim and receives deferred Cash payments at least equal in value to the allowed amount of its Claim with a present value as of the Effective Date at least equal in value to such creditor's interest in Dairy's interest in the property securing the creditor's Claim, (2) if property subject to the lien of the impaired secured creditor is sold free and clear of that lien, claim, interests or encumbrance, the lien, claim, interest or encumbrance attaches to the proceeds of the sale, and such lien, claim, interests or encumbrance proceeds are treated in accordance with clause (1) or (3) of the paragraph, or (3) the impaired secured creditor realizes the "indubitable equivalent" of its Claim under the Plan.

18

With respect to an unsecured claim, "fair and equitable" means either: (1) each impaired unsecured creditor receives or retains property of a value, as of the Effective Date, equal to the amount of its Allowed Claim, or (2) the Holders of Claims or Equity Interests that are junior to the Claims or interests of the dissenting Class will not receive or retain any property under the Plan.

With respect to equity interests, "fair and equitable" means that each Equity Interest Holder: (1) will receive or retain property of a value, as of the Effective Date, equal to the greatest of (a) the allowed amount of any fixed liquidation preference to which such Holder is entitled, (b) any fixed redemption price to which such Holder is entitled, or (c) the value of such Equity Interest; or (2) the Holder of any equity interest that is junior to the equity interests of such Class will not receive or retain any property under the Plan on account of such junior interest.

This Plan "does not discriminate unfairly" because all similar Classes are treated consistently and no Class receives more under the Plan than it is legally entitled to. In addition, the Plan is "fair and equitable" as to all impaired Classes because no junior Class will receive property under the Plan without the higher classes receiving 100% of its Prepetition Claim.

**D.     Best Interests**

The Bankruptcy Code provides that the Plan will not be confirmed, regardless of whether or not anyone objects to Confirmation, unless the Bankruptcy Court finds that the Plan is in the "best interests" of all Classes of Claims and Equity Interests which are impaired. The "best interests" test will be satisfied by a finding of the Bankruptcy Court that either: (1) all Holders of impaired Claims or Equity Interests have accepted the Plan, or (2) the Plan will provide such a Holder that has not accepted the Plan with a recovery at least equal in value to the

BDDB01 6324850v2

recovery such Holder would receive if Dairy was liquidating under chapter 7 of the Bankruptcy Code.

As set forth below, the Plan is in the "best interests" of each Class of Claims and Equity Interests which is impaired under the Plan.

The starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the liquidation of Dairy 's assets in the context of a chapter 7 liquidation. Such value must then be reduced by the costs of such liquidation, including costs incurred during the Dairy Chapter 11 Case and allowed under chapter 7 of the Bankruptcy Code (such as professionals' fees and expenses), a chapter 7 trustee's fees, and the fees and expenses of professionals retained by such a trustee. The potential chapter 7 liquidation distribution with respect to each Class must be further reduced by costs imposed by the delay caused by conversion of the Dairy Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. The net present value of a hypothetical chapter 7 liquidation distribution with respect to an impaired Class is then compared to the recovery in respect to such Class as provided for in the Plan. The Plan provides for a distribution greater than a distribution in the context of a hypothetical chapter 7 liquidation as under such liquidation no creditor other than AgStar PCA will likely see any recovery on account of its prepetition Claim or Equity Interest.

**E.    Feasibility**

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that such plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor. Dairy believes that the projections that will be provided as an Exhibit to the Disclosure Statement on or before the Disclosure Statement Exhibit Filing Date demonstrate that Dairy and Reorganized

20

Dairy can make the distributions required under the Plan and operate as going concerns continuing in business and contributing to the local economy.

## VIII.     <u>TAX CONSEQUENCES OF THE PLAN</u>

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. Dairy has not requested a ruling from the Internal Revenue Service or an opinion of counsel concerning same.

**ACCORDINGLY, ANY PERSONS WHO MAY BE AFFECTED BY IMPLEMENTATION OF THE PLAN, INCLUDING CREDITORS AND EQUITY INTEREST HOLDERS OF DAIRY, SHOULD CONSULT THEIR OWN TAX ADVISORS RESPECTING THE TAX CONSEQUENCES UNDER FEDERAL AND ANY APPLICABLE STATE, COMMONWEALTH, LOCAL OR FOREIGN LAW.**

## IX.     <u>CONCLUSION</u>

Dairy believes that the Plan represents the best alternative for Dairy, the Estate, and its creditors. Dairy urges all creditors entitled to vote to return their ballots accepting the Plan.

DATED: September 7, 2010

VAN HAM DAIRY, LLC
as Debtor and Debtor-in-Possession,

By: /s/ JohannusC. T .M. van Ham
          Manager/Member

21