UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION AT TOLEDO

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VAN HAM DAIRY, LLC, et al.,[1] | ) | Case No. 10-33231-RLS-11 |
| | ) | Hon. Richard L. Speer |
| | ) | (Jointly Administered) |
| | ) | |

## VAN HAM DAIRY, L.L.C.'S SECOND AMENDED DISCLOSURE STATEMENT (AS IMMATERIALLY MODIFIED)

**Counsel for the Van Ham Dairy, L.L.C.:**

John R. Burns (Ohio Bar #0003349)
111 East Wayne Street, Suite 800
Fort Wayne, IN  46802
Telephone:  (260) 424-8000
Facsimile:  (260) 460-1700
john.burns@bakerd.com

Terry E. Hall (Indiana Bar #22041-49)
300 N. Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone:  (317) 237-0300
Facsimile:  (317) 237-1000
terry.hall@bakerd.com

---

[1] The Debtor entities are Van Ham Dairy, LLC and Van Ham Dairy Leasing, LLC.

BDDB01 6391068v7

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 1

II. BACKGROUND OF DAIRY ..................................................................................... 2

    A. *The Original Dairy and Expansion* ............................................................... 2
    B. *The Loans* ..................................................................................................... 3
    C. *Events Leading to the Chapter 11 Filings* .................................................... 5

III. THE DAIRY CHAPTER 11 CASE .......................................................................... 8

IV. CLAIMS ANALYSIS ............................................................................................... 11

V. BUSINESS PLAN AND FINANCIAL PROJECTIONS ........................................ 12

VI. WHO MAY FILE A PLAN ...................................................................................... 13

VII. SUMMARY OF THE PLAN ................................................................................... 13

    A. Purpose of the Plan ...................................................................................... 13
    B. Administrative Claims and Priority Tax Claims .......................................... 13
    C. Classification and Treatment of the Claims and Equity Interests ............... 14
    D. Means For Funding and Implementing the Plan .......................................... 16
    E. Distribution of Property and Administration of the Plan ............................. 17
    F. Executory Contracts ..................................................................................... 18
    G. Management of the Reorganized Dairy ........................................................ 19
    H. Objections to Claims .................................................................................... 20
    I. Provisions of Classes Which Are Impaired and Do Not Accept the Plan ......... 20
    J. Exculpation, Discharge, and Injunction ...................................................... 20
    K. Reservation of Jurisdiction By the Bankruptcy Court ................................. 22
    L. Amendment, Modification or Revocation of the Plan. ................................. 22

VIII. LIQUIDATION ANALYSIS .................................................................................... 22

IX. CONFIRMATION OF THE PLAN .......................................................................... 23

    A. Acceptance of the Plan ................................................................................. 23
    B. Voting Claims Subject to a Pending Objection ............................................ 23
    C. No Unfair Discrimination/Fair and Equitable Test ..................................... 23
    D. Best Interests ................................................................................................ 25
    E. Feasibility ..................................................................................................... 26

X. TAX CONSEQUENCES OF THE PLAN ................................................................ 26

XI. CONCLUSION ......................................................................................................... 26

# PROPOSED DISCLOSURE

THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF OHIO, TOLEDO DIVISION (THE "BANKRUPTCY COURT"), HAS APPROVED THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT").  HOWEVER, THE BANKRUPTCY COURT'S APPROVAL DOES NOT CONSTITUTE A DETERMINATION OF THE MERITS OF THE ACCOMPANYING CHAPTER 11 PLAN (THE "PLAN").  THE BANKRUPTCY COURT HAS DETERMINED THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO ENABLE CREDITORS OF VAN HAM DAIRY, L.L.C., AS DEBTOR AND DEBTOR-IN-POSSESSION ("DAIRY"), TO MAKE AN INFORMED JUDGMENT IN EXERCISING RIGHTS TO VOTE UPON THE PLAN.

ONLY THIS DISCLOSURE STATEMENT IS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES FOR THE ACCEPTANCE OR REJECTION OF THE PLAN.  NO REPRESENTATION CONCERNING DAIRY, ITS BUSINESS OPERATIONS, OR THE VALUES OF ITS ASSETS IS AUTHORIZED BY THE BANKRUPTCY COURT, EXCEPT AS EXPLICITLY SET FORTH HEREIN OR IN ANY OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSIONER OF THE STATE OF OHIO OR ANY OTHER STATE OR COMMONWEALTH.  THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED HEREIN EXCEPT AS EXPRESSLY INDICATED HEREIN.  THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY DAIRY FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF DAIRY'S KNOWLEDGE, INFORMATION AND BELIEF.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN.  ALL CREDITORS AND OTHER INTERESTED PARTIES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.

# I.     INTRODUCTION

Pursuant to § 1125 of the Bankruptcy Code, Dairy hereby provides this Disclosure Statement to known creditors to disclose information deemed by Dairy to be material, important, and necessary for creditors to arrive at a reasonably informed decision in exercising their rights to vote for acceptance of the Plan. A copy of the Plan accompanies this Disclosure Statement. All capitalized terms used herein that are defined in Article I of the Plan shall have the meanings ascribed by the Plan unless the context in which such terms are used herein clearly dictate a different meaning.

**THIS DISCLOSURE STATEMENT AND THE PLAN ARE AN INTEGRATED PACKAGE AND BOTH SHOULD BE CONSIDERED TO PROVIDE ADEQUATE INFORMATION.**

**The Bankruptcy Court has scheduled a hearing on acceptance of the Plan for December 23, 2010 at 1:30 p.m. Eastern Standard Time in Courtroom No. 1, Room 119, United States Courthouse, 1716 Spielbusch Avenue, Toledo, Ohio. Creditors may vote on the Plan by filling out and mailing the accompanying ballot at a time and in a manner to cause the completed ballot to be actually received by the Bankruptcy Court on or before _____ __, 2010. As a creditor, your acceptance is important.**

**NO REPRESENTATIONS CONCERNING DAIRY (PARTICULARLY AS TO ITS FUTURE BUSINESS OPERATIONS OR VALUE OF PROPERTY) ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.**

## II.    BACKGROUND OF DAIRY

**A.    *The Original Dairy and Expansion***

J. van Ham and A. van Ham (the "van Hams") were successful owners of a family run commercial dairy farm in the Netherlands prior to immigrating to the United States in 2001 to open, own and operate a domestic commercial dairy facility with a capacity of 650 cows sited on 160 acres (the "Original Dairy") near Continental, Ohio. The van Hams were the sole owners of the Original Dairy and the Original Dairy was financed by Standard Federal Bank.

In 2006, the van Hams decided to expand their existing operations from 650 to 2200 cows. Vreba-Hoff Dairy Development, LLC ("Dairy Development"), a company that develops commercial dairy operations, assisted the van Hams in their expansion under a loan program Dairy Development had established with AgStar Financial Services, PCA ("AgStar PCA") and AgStar Financial Services, FLCA ("AgStar FLCA" and together with AgStar PCA may be collectively referred to as "AgStar") for the development and expansion of commercial dairy operations in the United States.

AgStar PCA and AgStar FLCA are federally chartered agricultural lending institutions, cooperatively owned by stockholders, under the Farm Credit Act, 12 U.S.C. §§ 2001-2279cc (as amended from time to time). AgStar PCA, as a production credit association, primarily makes loans to finance agricultural operations and equipment. AgStar FLCA, as a federal land credit association, primarily makes loans to finance the purchase of agricultural land. Dairy Development and AgStar entered into that certain "Program Guaranty" dated as of May 5, 2006 under which Dairy Development deposited $5 million with AgStar to secure payments to AgStar on borrowings by various dairies being developed by or with the assistance of Dairy Development ("Program Loan Guaranty").

2

BDDB01 6391068v7

The transaction among the van Hams, Dairy Development, and AgStar included the transfer of the Original Dairy and improvements (the "Real Property") to a new company organized by Dairy Development, called Van Ham Dairy Leasing, LLC ("Leasing"), with the operations, cattle, and certain equipment remaining in Van Ham Dairy, LLC (the "Dairy" or the "Debtor"). Simultaneous with the transfer of the Real Property, Dairy entered into a triple net lease dated as of November 26, 2006 (the "Lease") of the Real Property with Leasing. The Lease payment in effect during the construction of the expansion until the expansion was substantially completed was to be an amount invoiced by Leasing and intended to be the amount of the monthly principal and interest payments due Leasing's secured lender plus administrative expenses and an investment return to Leasing. Once the expansion was substantially complete, the rent payment was to be determined in good faith between Leasing and Dairy considering the fair market value of the Real Property after the expansion, the costs and terms of Leasing's financing of the expansion and other factors deemed relevant by Leasing. Dairy is also responsible for the amounts necessary to pay all costs of insurance, taxes, and maintenance of the Real Property ("Costs"). The Costs were and are being paid directly by Dairy.

## B.   *The Loans*

AgStar FLCA financed Leasing's construction of the improvements to and expansion of the Original Dairy under two notes, one dated as of November 28, 2006 in the original principal amount of $7.6 million (the "First FLCA Note") and a second dated as of June 6, 2007 in the original principal amount of $330,000 (the "Second FLCA Note" and, together with the First FLCA Note, may be referred to herein as the "FLCA Notes"). The First FLCA Note was to mature in November 2024 and required interest only payments for the first three years of the First FLCA Note with principal and interest payments scheduled to commence on December 1, 2009. The Second FLCA Note was to mature in June 2027 and required monthly interest and

3

principal payments. Leasing delivered two mortgages on the Real Property to AgStar FLCA to secure the FLCA Notes. AgStar FLCA also filed UCC-1 financing statements against the property of Leasing pursuant to a security agreement between Leasing and AgStar FLCA related to a mobile home trailer. AgStar asserts that the FLCA Notes are in default and the amounts due and owing under the First FLCA Note and the Second FLCA Note as of October 31, 2009 were $7,695,037.76 and $319,509.10, respectively, exclusive of attorneys' fees and costs, and that the FLCA Notes continue to accrue default interest and attorneys' fees and costs.

AgStar PCA financed Dairy's expansion of the operations of the Original Dairy under two notes, the first dated as of November 26, 2006 in the original principal amount of $370,000.00 (the "First PCA Note"), and the second dated as of August 7, 2008 in the original principal amount of $3,340,000.00 (the "Second PCA Note"). The First PCA Note was originally executed by Dairy and the van Hams individually as were a series of short term loan extensions extending the maturity date of the First PCA Note from its original December 2007 maturity date through August 1, 2008. In August 2008, the First PCA Note was renewed and Dairy Development and Ohio Dairy Holdings, LLC ("ODH")[2] signed as borrowers (the "Renewed First PCA Note" and, together with the Second PCA Note, the "PCA Notes"). The Renewed First PCA Note matured on August 1, 2009 and was not renewed thereafter.

The Second PCA Note was an interest only payment note, subject to change consistent with the change in the variable interest rate under the Second PCA Note, with payments

---

[2] In June 2008, an Amended and Restated Operating Agreement of Dairy was signed that granted ODH membership interests in Dairy in consideration of ODH transferring its real property interests in the Real Property to Dairy. The transfer of the Real Property interests did not occur.

4

beginning in September 2008 and maturing in August 2009.[3] The Second PCA Note was executed by Dairy Development, ODH, Dairy and individually by the van Hams.

The PCA Notes are secured by, among other things, a Security Agreement dated as of November 28, 2006, perfected by a UCC-1 financing statement recorded on December 7, 2006. AgStar PCA asserts the balances due and owing as of March 29, 2010 on the Renewed First PCA Note and the Second PCA Note were $79,578.00 and $3,461,829.88, respectively, exclusive of attorneys' fees and costs and accruing interest at default rates plus attorneys' fees, costs and other charges pursuant to their terms. In November 2006, Leasing and the van Hams delivered an "acknowledgement" of the Program Loan Guaranty to AgStar PCA making them eligible as a "Program Participant" under the Program Loan Guaranty agreement.

As a condition to making the loans and as a Program Participant under the Program Loan Guaranty agreement, AgStar PCA required Dairy Development to make a $1,373,742 cash investment in Dairy ("Dairy Development Investment"). Dairy Development did not make the Dairy Development Investment in cash and instead in February 2008 sold 1,570 cows ("Expansion Cows") to Dairy at a price of $2,500[4] per cow with a sufficient amount of the value of the cows being applied to the Dairy Development Investment and the balance of the purchase price being paid to Dairy Development by Dairy drawing down $2,225,000 on the Second PCA Note.

C.     *Events Leading to the Chapter 11 Filings*

The expansion of the Original Dairy was expected to be completed within five to six months, but due to factors beyond the control of Dairy, the expansion took close to two years to

---

[3] The Second PCA Note contains an Adjustable Rate LIBOR Based interest rate (as defined in the Second PCA Note) plus a margin of 3.25 percentage points that is subject to adjustment on the first day of each calendar month.

[4] The market value for similar age and quality cows was approximately $1600 at that time.

5

complete. During the construction, Dairy made payments to Leasing under the Lease of varying amounts. The expansion was substantially completed and the Expansion Cows were purchased in or about February 2008. Following the completion of the expansion, Dairy paid monthly rent to Leasing in the amounts determined by Leasing under the Lease.

In 2007, milk prices were high and Dairy was able to pay its debts, make its rent payments to Leasing, and fund its operations. This continued into 2008 until milk prices began an unexplained and accelerating decline late in 2008. By the middle of 2009, milk prices were at all time lows and nearly every commercial dairy farm in the United States was in deep financial trouble. Unfortunately, many of the Expansion Cows were older, in late lactation and not pregnant; therefore, the milk production of the expanded Dairy was significantly less than what would have been expected. Further, the Expansion Cows needed to be culled at a higher than normal rate resulting in higher than normal replacement costs to Dairy. To add to the difficulties of the dairy industry and Dairy, commodity prices reached high levels and feed expenses rose precipitously. The combination of the long construction period for the expansion, lower than expected milk production, crashing milk prices, and soaring feed prices resulted in severe cash constraints on Dairy.

In August 2009, AgStar sent notices of default on both the AgStar PCA Notes and the AgStar FLCA Notes to Dairy and Leasing. On November 24, 2009, AgStar FLCA filed a complaint for foreclosure, replevin and other relief against Leasing ("Leasing Complaint") in the United States District Court for the Northern District of Ohio, Western Division (the "Leasing District Court Case"). Dairy was named as a defendant in the Leasing District Court Case solely to assert any interest that Dairy may have in the Real Property.

BDDB01 6391068v7

Following the filing of the Leasing Complaint, Dairy continued to make its interest payments at the non-default rate on the PCA Notes and, in accordance with the PCA Loans, began submitting its payments under the Lease directly to AgStar FLCA. Dairy began searching for alternative financing sources, but credit was essentially non-existent for dairy operations during 2009 and the first half of 2010. While searching for financing, Dairy was able to use its good name, its history of paying its bills, and its long history in the community to purchase on unsecured credit 300 fresh heifer cows[5] from one of its long time vendors in the first quarter of 2010 and culled some of the most unproductive Expansion Cows. Dairy saw the purchase of the 300 fresh heifers as essential to turning around its declining profits. Once the new cows became fully productive, Dairy's income increased and it began to catch up its payments to suppliers and stayed in negotiation with AgStar to restructure its debts and continue in business.

Dairy generated small operating profits from November 2009 through March 2010.[6] In February 2010, Dairy's newly purchased cows began to get fully acclimated to their new surroundings, and Dairy recorded an operating profit of $84,266.63 (see footnote 6).

On March 29, 2010, AgStar initiated a separate complaint against Dairy (the "Dairy Complaint") in the United States District Court for the Northern District of Ohio (the "Dairy District Court Case"), and sought the appointment of a receiver on an emergency basis (the "Receivership Motion") in both the Leasing District Court Case and the Dairy District Court Case. The next day, on March 30, 2010, the District Court entered an Order Appointing Receiver over the property of Leasing in the Leasing District Court Case and over the property of Dairy in the Dairy District Court Case (the "Receivership Orders"). The Receivership Orders

---

[5] A fresh heifer is a cow that has just born its first calf. A fresh heifer will come into its highest milk production three months after calving.

[6] The operating profits recorded by Dairy have been contested by AgStar which challenges the accounting system used by Dairy's prepetition accounting firm, Dairy Development.

BDDB01 6391068v7

appointing the receiver, Roach & Associates, LLC ("RA"), became effective on April 5, 2010 upon the filing of an oath by RA. RA was not required to post a bond. Dairy has appealed the order appointing RA and a companion order of possession entered by the District Court over the property of Dairy. That appeal remains pending.

On May 10, 2010, Dairy filed its chapter 11 case to reorganize its debt and business and continue as a valuable contributor to the local economy of northeastern Ohio.

On September 3, 2010, Leasing filed its chapter 11 case to reorganize with the Dairy.

### III.    THE DAIRY CHAPTER 11 CASE

The appointment of RA complicated the initial days of the Dairy Chapter 11 Case. Upon the filing of the Dairy Chapter 11 Case and the entry of the order for relief, all property of Dairy came under the jurisdiction of the Bankruptcy Court. The Dairy filed "First Day" motions to smooth its operations into chapter 11 seeking, among other things, to use its cash, continue use of its existing banking relationships, pay its employees, taxes, and insurance and employ professionals to assist it during the Dairy Chapter 11 Case.

AgStar believed that the foreclosures against Dairy should go forward and resisted the removal of RA and filed pleadings seeking to excuse RA's duty to comply with the Bankruptcy Code to return possession and control of Dairy's property to Dairy and asking the Bankruptcy Court to decline to continue jurisdiction over the Dairy Chapter 11 Case. Dairy objected to these motions and prior to the hearing set to resolve the disputes, AgStar and Dairy reached an interim agreement and submitted that certain Stipulated Order [Docket No. 118] (the "Stipulated Order") which was signed by the Bankruptcy Court on June 2, 2010 and entered on the docket in the Dairy Chapter 11 Case on June 5, 2010.

Under the Stipulated Order and during the time period expiring on the 90th day following entry of the Stipulated Order (the "Interim Period"), RA, as an "excused custodian" and Dairy, as

8

a debtor in possession, worked together under an agreed budget to run the Dairy's operations; however, RA retained final decision making authority. Pursuant to the Stipulated Order, the Interim Period could be briefly extended if, prior to its expiration, AgStar, the U.S. Trustee or the Committee filed a motion to appoint a chapter 11 trustee or an examiner in the Dairy Chapter 11 Case. If that occurred, the Interim Period would then continue until two business days following the entry of an order disposing of any such motion. On August 25, 2010, AgStar filed a motion seeking the appointment of a chapter 11 trustee [Docket No. 195]. Pursuant to that certain Agreed Order Resolving Pending Motions Relating to the Appointment of a Chapter 11 Trustee and Continued Service of Roach & Associates, LLC as Excused Custodian Entered in this Bankruptcy Case [Docket No. 302] entered by the Bankruptcy Court on October 28, 2010, RA's service as excused custodian was terminated and AgStar withdrew its motion seeking appointment of a Chapter 11 trustee, without prejudice to refiling.

On May 15, 2010, pursuant to §1102(a) an Official Committee of Unsecured Creditors was appointed in the Dairy Chapter 11 Case and employed Raymond L. Beebe of Raymond L. Beebe Co. LPA, as counsel. Dairy is represented in this Chapter 11 Case by Baker & Daniels LLP, and AgStar is represented by Hahn Loeser & Parks LLP.

In this case, Dairy took advantage of the advice and experience of RA and the dairy professionals he employed implementing changes to its operations that have contributed to the increased efficiency and profitability of the Dairy.[7] During the Chapter 11 Case, Dairy has continued to operate at a cash profit and further stabilized its business, entered into ordinary course of business contracts for feed, negotiated forage and corn silage contracts, remained current with its vendors, and increased per cow milk production at times averaging 77 pounds

---

[7] AgStar believes that the Dairy had operational deficits in its management and business controls that contributed to the difficulty the Dairy had in making its debt payments.

BDDB01 6391068v7

per cow per day. Those changes have been incorporated into the business practices of Dairy and Dairy intends to continue those practices post-Confirmation. In addition, Dairy has made changes to its employees' duties and functions upon the recommendation of RA. RA replaced the herdmaster and nutritionist of Dairy with its recommended personnel. Dairy intends to seek permanent replacements of those two positions based upon recommendations and assistance from RA. While Dairy seeks a permanent herdmaster, it intends to retain the services of RA as consultant to assist in the interviewing process and operations. As stated above, and by agreement of the parties, RA's tenure as an excused custodian terminated on November 1, 2010.

Dairy's total herd numbers are slightly less than on the Petition Date, but the improvement in the composition of the herd begun prior to the filing has continued as the less productive Expansion Cows have been culled and replaced with younger, more productive cows. Pursuant to the reports filed by RA (as the reporting body during the Interim Period), Dairy is operating consistently with its cash projection (although the purchase of additional cows is less than was projected), has made principal and interest payments on the debt Dairy owes to AgStar PCA and, as rent, the principal and interest payments on the debt Leasing owes to AgStar FLCA, has operated within its budget and has been able to pay RA, the Committee's and its own professionals.[8]

Dairy is current on its obligations to pay property taxes on the Leasing Real Property, has maintained all necessary insurance and continues to enjoy the support of ongoing business relationships with its prepetition vendors, contract parties, and community. Dairy expects

---

[8]The monthly PCA payment totals $70,012.00 calculated as the principal and default interest payment on the Dairy's PCA Notes amortized over five (5) years at 5.5% APR. The rent payment is not less than $48,869.00 calculated as the principal and interest payment Leasing owes to AgStar FLCA on the FLCA Notes at a non-default interest rate and, as if such FLCA Notes are not in default and had not been accelerated. Adequate protection payments to AgStar FLCA are not more than $43,369.00 per month.

10

continued profitable performance through the balance of the Chapter 11 Cases and after Confirmation of the Plans.

## IV.     <u>CLAIMS ANALYSIS</u>

On July 28, 2010, the Bankruptcy Court entered an Order (the "<u>Bar Date Order</u>") establishing deadlines for filing proofs of claim against Dairy (each a "<u>Bar Date</u>"). The Bar Date for filing proofs of claim by non-governmental creditors was set as August 27, 2010 and the bar date for governmental creditors was set at November 8, 2010. On August 4, 2010, Dairy filed a certificate of service stating that the Notice of the Bar Date Order and the form of notice and proof of claim form approved under the Bar Date Order were served on July 30, 2010 on all creditors and notice parties listed on the creditor matrix and on all counsel of record. The Bar Dates for non-governmental units and for governmental units have passed. All filed claims are available for electronic viewing at the Bankruptcy Court's website under the Dairy's Chapter 11 Case. A subscription to PACER, the Court's online service, is necessary for viewing the claims electronically.

Twenty-three proofs of claim were filed as of the date of this Second Amended Disclosure Statement. Dairy's analysis of its filed and scheduled claims is as follows:

- Two secured claims totaling $3,587,414.38 for AgStar PCA and CNH Capital will be allowed and treated under the Plan.

- One priority tax claim in the amount of $67,000 will be paid pursuant to the Plan.

- Dairy has not completed its verification of all of the general unsecured claims as filed, but estimates the total general unsecured claims, other than Claim No. 22 filed by the Ohio Department of Agriculture ("<u>ODA</u>"), to be about $2.1 million.

- Claim No. 22 filed by ODA alleging some past and present violations is being investigated by Dairy and its environmental counsel. While Dairy believes that it will be able to resolve the issues raised in the ODA Claim at a nominal cost, Dairy is unable

at this time to offer an estimate of when and for how much the ODA Claim will be resolved.

## V.     BUSINESS PLAN AND FINANCIAL PROJECTIONS

The proposed restructuring plan for Dairy is built on continuing efficient, profitable practices of increasing the quality of the herd and the timely culling of less productive cattle to maintain an optimum herd size of about 2,300 cattle. Dairy will continue to improve on its processes and scheduling, and is planning on integrating its financial and operational reporting tools to provide an accurate and timely basis to identify and resolve issues before they can affect operations. Dairy also intends to investigate contracts that would hedge against severe price fluctuations in milk prices and feed prices to provide stability in Dairy's business operations.

Dairy is in the process of replacing its herdmaster and is interviewing candidates. Dairy has asked for recommendations and assistance in evaluating the experience and credentials of potential candidates from RA and other professionals in the field. As mentioned earlier, Dairy has, subject to Bankruptcy Court approval, agreed to retain RA as a consultant to Dairy for a short period to assist in the evaluation of potential herdmasters and to advise on operations.

Dairy's restructuring plan calls for the merger of Leasing into Dairy after confirmation of both plans. At the conclusion of the merger, Dairy will own all the real and personal property on and with which Dairy operates and be responsible for paying the Allowed Claims under the Leasing plan, including the Allowed Claim of AgStar FLCA.

Based on its analysis of performance and under certain conservative assumptions, Dairy has projected its monthly business income and expense for the months following its emergence from chapter 11. The projections are attached as Exhibit A to this Disclosure Statement or will be filed on the Disclosure Statement Exhibit Filing Date and may be subsequently amended.

12

The projections indicate that the Dairy will be able to continue in business, pay its bills as they come due, and make timely payments on its secured debt, including payments on the Prepetition unsecured Claims under the Plan.

## VI.    WHO MAY FILE A PLAN

Dairy has the exclusive right to file a plan in the Dairy Chapter 11 Case through and including September 7, 2010. Dairy filed its Plan and Disclosure Statement on September 7, 2010.

## VII.    SUMMARY OF THE PLAN

A copy of the Plan accompanies this Disclosure Statement. The Plan should be referred to for details concerning the treatment and classification of creditors and interest holders. The following summary is qualified in its entirety by the express provisions of the Plan.

### A.    Purpose of the Plan

The purpose of the Plan is to provide Dairy with an ownership structure and debt structure that can be supported by operations. Dairy believes that the reorganization, including the Merger, contemplated by the Plan is in the best interests of creditors as a whole. If the Plan is not confirmed, Dairy believes that it will be forced to liquidate under chapter 7 of the Bankruptcy Code. In that event, Dairy believes that no general unsecured creditor will realize any value from the liquidated estate. A liquidation analysis is discussed in Article VIII.

### B.    Administrative Claims and Priority Tax Claims

Administrative Claims representing costs incurred in the ordinary course of business and not yet paid will be paid by Dairy on the date such debt is due.[9] Payments owed to the United States Trustee will be paid in the ordinary course when due. Final payments to Dairy's

---

[9] The Dairy entered into postpetition contracts for the purchase of corn silage from area growers and granted a purchase money security interest to the growers. Those contracts will be honored and paid according to their terms.

13

BDDB01 6391068v7

professionals will be paid within thirty (30) days of the date such applications for payment are allowed by order of the Bankruptcy Court, subject to the budget limitations imposed by the existing cash collateral order and projection attached to this Disclosure Statement as Exhibit A, as set forth in Section 2.2 of the Plan. Allowed Priority Claims for taxes will be paid in forty-eight equal monthly installments of principal, together with interest at the rate of three and one quarter percent (3.25%) per annum.

## C.  Classification and Treatment of the Claims and Equity Interests

### 1.  Summary

A summary of the treatment of the classified claims is as follows:

| Class/Type of Claim or Equity Interest | Estimated Allowed Claims Amount[10] | Treatment | Projected Recovery Under Plan | Impaired/ Unimpaired |
|---|---|---|---|---|
| Class 1: Allowed Secured Claim of AgStar PCA | $3,565,143.59[11] | AgStar PCA New Note, 7 years amortization (5 year maturity at 7.25% interest), liens retained | 100% | Not impaired, deemed to accept the Plan |
| Class 2: Allowed Secured Claim of CNH Capital | $22,174.23 | Non-recourse New Note at 0% interest payable in monthly installments and due in full on June 30, 2011, liens retained | 100 % | Impaired and allowed to vote |
| Class 3:  Allowed Other Secured Claims | $0 | To be determined by Dairy and Claimant | 100% | Not impaired/no voting |
| Class 4: Allowed Other Priority Claims | $0 | To be determined by Dairy and Claimant | 100% | Not impaired/no voting |
| Class 5: Allowed Unsecured Claims | $2,100,000 | Notes payable with a 10-year amortization and a five year maturity at 3.25% payable quarterly and prorate share of the New Equity Contribution | 60% | Impaired/ voting |

---

[10]  The estimated Allowed amount of a Secured Claim has not been adjusted for any adequate protection payments or other payments made by Dairy during the Chapter 11 Case and may be reduced accordingly.

[11]  Principal balance may be adjusted by payments made during the Chapter 11 Case.  See claim treatment for more explanation.

14

| Class/Type of Claim or Equity Interest | Estimated Allowed Claims Amount[10] | Treatment | Projected Recovery Under Plan | Impaired/ Unimpaired |
|---|---|---|---|---|
| Class 6: Allowed Equity Interests | $0 | Equity interests will be cancelled | 0% | Impaired/no voting |

## 2.     Treatment of Claims and Equity Interests

a.     <u>Secured Claims</u>.  The Allowed Secured Claim of AgStar PCA (Class 1) is valued at $3,565,143.59.  The Holder of the Allowed Secured Claim of AgStar PCA will receive under the Plan a new note (the "<u>AgStar PCA New Note</u>") amortizing the principal amount of $3,505,143.59 over 7 years at a fixed rate of interest of 7.25% per annum, with a maturity date of five (5) years from the Effective Date; post-petition adequate protection payments made by Dairy to AgStar PCA shall be applied first to the non-default interest accrued on the amounts due and owing under the AgStar PCA Loans from the Petition Date through and including the Effective Date, and payments in excess thereof shall be applied to reduce the Allowed Secured Claim of AgStar PCA.  Among other terms and conditions to be contained in the AgStar PCA New Note, AgStar PCA shall retain its security interests in substantially all of the assets of Reorganized Dairy to the full extent of such security interests under the AgStar PCA Loans until the Allowed Secured Claim of AgStar PCA is paid in full.

As part of the Merger, Reorganized Dairy shall assume Reorganized Leasing's obligations under the AgStar FLCA New Note, executed by Leasing under the Leasing Plan. The AgStar PCA New Note and the AgStar FLCA New Note shall be cross-defaulted and cross-collateralized.  Class 1 is not impaired, and is deemed to have accepted the Plan.

The Holder of the Allowed Secured Claim of CNH Capital (Class 2) will receive under the Plan a new note amortized over 1 year at a fixed rate of interest of 0% and payable in monthly installments.  No prepetition late charges, default interest or postpetition interest shall be included in the Allowed Secured Claim of CNH Capital.  Class 2 is impaired and is entitled to

15

BDDB01 6391068v7

vote on the Plan. Dairy is not aware of any other secured Claims that are not in Class 1 or Class 2.

        b.    <u>Unsecured Priority Claims Other Than Tax Claims (Class 4)</u>. Dairy is not aware of any priority unsecured claims that are not tax claims.

        c.    <u>Unsecured Claims</u>. The Holders of Allowed Unsecured Claims (Class 5) shall be issued new notes in the principal amount of sixty percent (60%) of their respective Allowed Class 5 Claim, amortized over ten years at 3.25% interest, but maturing 60 months from the Effective Date of the Plan. On the first Distribution Date Holders of Allowed Class 5 Claims will receive (i) the Unsecured Creditors Note, (ii) payment *pro rata* of the New Equity Contribution, and (iii) the first payment due on the respective Unsecured Creditors Notes. Payments on the Unsecured Creditors Note due thereafter will be made on a quarterly basis. Class 5 is impaired and Holders of Allowed Class 5 Claims are entitled to vote on the Plan.

        d.    <u>Equity Interests</u>. The prepetition Equity Interests will be cancelled and no property will be retained or received on account of the prepetition Equity Interests. New equity interests consisting of all the membership units of Reorganized Dairy will be issued to the van Hams in consideration of (a) the New Equity Contribution in the amount of $60,000.00 to be contributed by the van Hams as new value and (b) the van Hams guaranteeing the post-Merger senior secured debt of Reorganized Dairy.

## D.    **Means For Funding and Implementing the Plan**

    The central method for implementing the Plan will be through the Merger of Reorganized Leasing into Reorganized Dairy on the Effective Date. Reorganized Dairy will assume and pay Reorganized Leasing's debt obligations under the confirmed Leasing Plan, which obligations include payment of the AgStar FLCA New Note, the Unsecured Creditors Payment, and administrative costs allowed in the Leasing Chapter 11 Case. The Plan will be funded by the

16

post-Merger operation of the Reorganized Dairy's business and the New Equity Contribution to be made by the van Hams.

**E.**     <u>Distribution of Property and Administration of the Plan</u>

      **1.**     **Vesting of Property in Reorganized Dairy**

Except as otherwise provided in the Plan, all of the assets, properties and rights of Dairy owned by Dairy of every type and description, tangible, intangible, wherever located, shall be transferred and automatically vested in Reorganized Dairy as of the Effective Date free and clear of all liens, claims, rights of setoff, security interests, pledges, encumbrances, adverse rights of interest, covenants, charges, debts and contractually imposed restrictions, and all such liens, claims, rights of setoff, security interests, pledges, encumbrances, adverse rights of interest, covenants, charges, debts and contractually imposed restrictions, except such liens as are expressly provided in the Plan. Moreover, all Causes of Action except those waived or released (under any theory of law or equity, including, without limitation, the Bankruptcy Code, and in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Dairy Chapter 11 Case but excluding Bankruptcy Causes of Action) of Dairy shall be transferred on the Effective Date to Reorganized Dairy. Reorganized Dairy shall then have the right to commence and pursue all Causes of Action. Upon information and belief, those Causes of Action consist primarily of rights to collect accounts receivable owing as of the Effective Date.

      **2.**     **Organizational Authorization**

The entry of the Confirmation Order shall constitute authorization for Dairy and Reorganized Dairy to take or cause to be taken all organizational action necessary and appropriate to consummate and implement the Plan and the Merger (including the adoption of a plan of merger and related documents to achieve and consummate the Merger and the amendment of Reorganized Dairy's articles of organization and operating agreement, as

17

applicable) prior to and after the Effective Date, and all such organizational actions taken or caused to be taken shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by Dairy, Reorganized Dairy or their members or managers. On or before the Effective Date, and contemporaneously with the Merger, Dairy and Reorganized Dairy shall be authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan.

**F.**     <u>**Executory Contracts**</u>

Except as otherwise provided in the Plan, effective on and as of the Effective Date any and all Executory Contracts that exist between Dairy and any party which: (a) have not expired or terminated pursuant to their own terms; (b) have not previously been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date; (c) are not the subject of pending motions to assume, or assume and assign, or reject as of the Confirmation Date; (d) are not specified in the list of Executory Contracts to be assumed by Dairy pursuant to the Plan as set forth on <u>Exhibit C</u> attached thereto, are hereby specifically rejected; *provided, however,* that Dairy shall have the right, at any time prior to the Effective Date, to amend <u>Exhibit C</u> to add or delete any Executory Contract listed therein, thus providing for its rejection or assumption pursuant to Article IV of the Plan; and the unexpired Lease (as defined in this Disclosure Statement) shall as part of the Merger be merged with the fee of the Real Property and not rejected. The Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute an order of the Bankruptcy Court: (x) approving such assumption as of the Effective Date pursuant to §§ 365 and 1123(b)(2) of the Bankruptcy Code; (y) extending the time, pursuant to § 365(d)(4) of the Bankruptcy Code, within which Dairy may assume, assume and assign, or reject such Executory Contracts through the date of

18

entry of an order approving the assumption, assumption and assignment, or rejection of such Executory Contract; and (z) approving, pursuant to §§ 365(a) and 1123(b)(2) of the Bankruptcy Code, the rejection of the Executory Contracts.

Reorganized Dairy will satisfy all undisputed cure amounts and any other monetary default payments required by § 365(b)(1) of the Bankruptcy Code under any Executory Contract identified on <u>Exhibit C</u> to the Plan (as may be modified in accordance with § 4.1 of the Plan), to the extent any such Executory Contract is in default (and to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law), or the counter-party to such Executory Contract has not waived any monetary amounts arising prior to the Petition Date, by the payment of such undisputed cure amounts as agreed to by Reorganized Dairy and the counterparty to the Executory Contract or as determined by Final Order of the Bankruptcy Court. Executory Contract cure obligations, if not previously determined by an order of the Bankruptcy Court prior to the Effective Date, may be paid without further order of the Bankruptcy Court if such cure amounts are agreed to by Reorganized Dairy and the counterparty to such Executory Contracts. To the extent Reorganized Dairy and the counterparty to an Executory Contract cannot agree as to a particular cure amount, then such amounts will be determined by the Bankruptcy Court after notice and a hearing.

## G.  **Management of the Reorganized Dairy**

Jan van Ham shall continue to serve as the manager/operator of Reorganized Dairy. Dairy intends to hire, with the recommendation and assistance of RA, a new herdmaster who will be responsible for the day to day management of the herd. Reorganized Dairy is employing Genske, Mulder & Co., LLP of Ontario, California, as its accounting and tax advisors and will employ Barron Business Consulting, Inc., as its financial and business advisor during its transition from Chapter 11.

**H.**     <u>**Objections to Claims**</u>

Dairy and/or Reorganized Dairy shall have the right to file objections to Claims through and including sixty (60) days following the Effective Date or as otherwise ordered by the Bankruptcy Court.

**I.**     <u>**Provisions of Classes Which Are Impaired and Do Not Accept the Plan**</u>

Under the Bankruptcy Code, Holders of Claims in Classes which are impaired are entitled to vote on the Plan, unless the Holder of such a Claim is an insider or such Class shall not retain or receive any property on account of its Prepetition Claim. Classes 2 and 5 are impaired and the Holders of Allowed Class 2 and Class 5 Claims may vote to approve or reject the Plan.

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan notwithstanding the failure of an impaired Class to vote in favor of the Plan if the Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims that is impaired and has not accepted the Plan. Dairy intends to ask the Bankruptcy Court to implement the provisions of § 1129(b) of the Bankruptcy Code to achieve confirmation of the Plan in the event an impaired Class does not vote in favor of the Plan.

**J.**     <u>**Exculpation, Discharge, and Injunction**</u>

Dairy and Reorganized Dairy, the Committee, and their respective officers, directors, managers, members, shareholders, employees, agents, and professionals (acting in such capacity) and AgStar FLCA, AgStar PCA and their respective parent, subsidiaries, affiliates, officers, directors, managers, members, shareholders, employees, agents, and professionals (collectively, the "<u>Exculpated Parties</u>") shall neither have nor incur any liability to any Person or Entity for any Prepetition or Postpetition act taken, or omitted to be taken, in connection with, or related to,

BDDB01 6391068v7

formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any contract, instrument, release or any other agreement or document created, or entered into, in connection with the Plan, or any other Prepetition or Postpetition act taken, or omitted to be taken, in connection with, or in contemplation of the Dairy Chapter 11 Case. For purposes of clarity, the foregoing exculpation shall not apply to any liability of any such Person to AgStar PCA or AgStar FLCA (a) which arose Prepetition and is not treated in this Plan or (b) which arises pursuant to this Plan upon or after its confirmation.

Except as otherwise provided in § 1141(d) of the Bankruptcy Code, the Plan, the Confirmation Order, or any notes delivered under the Plan, including the AgStar FLCA New Note, the AgStar PCA New Note, and the Unsecured Creditors' Notes, confirmation of the Plan shall discharge Dairy and Reorganized Dairy from any debt that arose before the Confirmation Date and any debt of a kind specified in § 502(g), (h) or (i) of the Bankruptcy Code.

On and after the Effective Date and except as provided in the Plan, all Persons and/or Entities are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any Claim, debt, interest or right of Dairy or Reorganized Dairy (either prior to or after the Merger) as well as on account of or respecting any Cause of Action or Bankruptcy Cause of Action of Dairy for which Dairy and Reorganized Dairy retain sole and exclusive authority to pursue in accordance with this Plan.

As to the Effective Date, Dairy and Reorganized Dairy waive and release any and all Causes of Action each may have against AgStar PCA and AgStar FLCA.

BDDB01 6391068v7

Unless otherwise provided herein or by an order of the Bankruptcy Court, all injunctions or stays provided for in the Dairy Chapter 11 Case pursuant to § 105 or § 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until all distributions required to be made under this Plan have been made.

**K.**     **Reservation of Jurisdiction By the Bankruptcy Court**

The Plan provides that the Bankruptcy Court will retain jurisdiction over the Chapter 11 Cases after Confirmation for various purposes as detailed in Article XI of the Plan.

**L.**     **Amendment, Modification or Revocation of the Plan.**

Dairy reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and subject to advance written approval by AgStar to amend or modify the Plan at any time prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order, Dairy or Reorganized Dairy may, upon notice and hearing and an order of the Bankruptcy Court and approval by AgStar, amend or modify the Plan in accordance with § 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A Holder of a Claim that is deemed to have accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such Holder.

## VIII.     LIQUIDATION ANALYSIS

Holders of Claims in impaired Classes will receive a distribution under the Plan greater than they would receive under a chapter 7 forced liquidation sale.  If the Dairy were liquidated, no monies will be available to pay unsecured creditors and the return to secured creditors will be less than projected.   A liquidation analysis will be provided on or before the Disclosure Statement Exhibit Filing Date as <u>Exhibit B</u>.

BDDB01 6391068v7

# IX. CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan if all of the requirements of § 1129 of the Bankruptcy Code are met. Among the requirements for Confirmation are that the Plan: (1) is accepted by all impaired Classes of Claims or Equity Interests entitled to vote or, (2) if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class.

## A. Acceptance of the Plan

The Bankruptcy Code defines acceptance of a Plan by a class of creditors as acceptance by creditors holding two-thirds (2/3) in dollar amount and a majority in number of the claims in such class (other than any such creditor designated under § 1126(e) of the Bankruptcy Code), but for this purpose only counts those creditors that actually return ballots. Holders of Claims that fail to vote are not counted as either accepting or rejecting the Plan.

## B. Voting Claims Subject to a Pending Objection

The Holder of a Disputed Claim is not entitled to vote on the Plan absent further order of the Bankruptcy Court resolving any objection or estimating the claim for purposes of voting.

## C. No Unfair Discrimination/Fair and Equitable Test

In the event that any impaired Class does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of Dairy if, as to each impaired Class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."

A plan under chapter 11 of the Bankruptcy Code "does not discriminate unfairly," within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it is legally entitled to receive for its claims or equity interests.

BDDB01 6391068v7

Under the Bankruptcy Code, "fair and equitable" has different meanings for secured and unsecured claims. With respect to a secured claim, "fair and equitable" means: (1) the impaired secured creditor retains its liens to the extent of its Allowed Secured Claim and receives deferred cash payments at least equal in value to the allowed amount of its claim with a present value as of the effective date at least equal in value to such creditor's interest in the debtor's interest in the property securing the creditor's claim, (2) if property subject to the lien of the impaired secured creditor is sold free and clear of that lien, claim, interests or encumbrance, the lien, claim, interest or encumbrance attaches to the proceeds of the sale, and such lien, claim, interests or encumbrance proceeds are treated in accordance with clause (1) or (3) of this paragraph, or (3) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

With respect to an unsecured claim, "fair and equitable" means either: (1) each impaired unsecured creditor receives or retains property of a value, as of the effective date, equal to the amount of its allowed claim, or (2) the holders of claims or equity interests that are junior to the claims or interests of the dissenting class will not receive or retain any property under the plan.

With respect to equity interests, "fair and equitable" means that each equity interest holder: (1) will receive or retain property of a value, as of the effective date, equal to the greatest of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled, or (c) the value of such equity interest; or (2) holding an equity interest that is junior to the equity interests of such class will not receive or retain any property under the plan on account of such junior interest.

This Plan "does not discriminate unfairly" because all similar Classes are treated consistently and no Class receives more under the Plan than it is legally entitled to. In addition, the Plan is "fair and equitable" as to all impaired Classes because no junior Class will receive or

BDDB01 6391068v7

retain property under the Plan on account of its prepetition Claim or Interest if a higher class is receiving less than 100% of its Prepetition Claim.

## D. <u>Best Interests</u>

The Bankruptcy Code provides that a plan will not be confirmed, regardless of whether or not anyone objects to confirmation, unless the bankruptcy court finds that the plan is in the "best interests" of all classes of claims and equity interests which are impaired. The "best interests" test will be satisfied in this Case by a finding of the Bankruptcy Court that either: (1) all Holders of impaired Claims or Equity Interests have accepted the Plan, or (2) the Plan will provide such a Holder that has not accepted the Plan with a recovery at least equal in value to the recovery such Holder would receive if Dairy were liquidating under chapter 7 of the Bankruptcy Code.

As set forth below, the Plan is in the "best interests" of each Class of Claims and Equity Interests which is impaired under the Plan.

The starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the liquidation of Dairy's assets in the context of a chapter 7 liquidation. Such value must then be reduced by the costs of such liquidation, including costs incurred during the Dairy Chapter 11 Case and allowed under chapter 7 of the Bankruptcy Code (such as professionals' fees and expenses), a chapter 7 trustee's fees, and the fees and expenses of professionals retained by such a trustee. The potential chapter 7 liquidation distribution with respect to each Class must be further reduced by costs imposed by the delay caused by conversion of the Dairy Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. The net present value of a hypothetical chapter 7 liquidation distribution with respect to an impaired Class is then compared to the recovery in respect to such Class as provided for in the Plan. The Plan provides for a distribution greater than a distribution in the

25

context of a hypothetical chapter 7 liquidation as under such liquidation no creditor other than AgStar PCA will likely see any recovery on account of its prepetition Claim or Equity Interest. Dairy will file its liquidation analysis as <u>Exhibit B</u> on or before the Disclosure Statement Exhibit Filing Date.

E.      <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the bankruptcy court finds that such plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor. Dairy believes that the projections provided as <u>Exhibit A</u> to this Disclosure Statement on or before the Disclosure Statement Exhibit Filing Date will demonstrate that Dairy and Reorganized Dairy can make the distributions required under the Plan and continue to operate as a going concern continuing in business and contributing to the local economy.

## X.      TAX CONSEQUENCES OF THE PLAN

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. Dairy has not requested a ruling from the Internal Revenue Service or an opinion of counsel concerning same.

**ACCORDINGLY, ANY PERSON WHO MAY BE AFFECTED BY IMPLEMENTATION OF THE PLAN, INCLUDING CREDITORS AND EQUITY INTEREST HOLDERS OF DAIRY, SHOULD CONSULT THEIR OWN TAX ADVISORS RESPECTING THE TAX CONSEQUENCES UNDER FEDERAL AND ANY APPLICABLE STATE, COMMONWEALTH, LOCAL OR FOREIGN LAW.**

## XI.      <u>CONCLUSION</u>

Dairy believes that the Plan represents the best alternative for Dairy, the Estate, and its creditors. Dairy urges all creditors entitled to vote to return their ballots accepting the Plan.

BDDB01 6391068v7

DATED: November 16, 2010

VAN HAM DAIRY, L.L.C.
as Debtor and Debtor-in-Possession,

By: /s/ Johannus C. T .M. van Ham
　　　Manager/Member

27

BDDB01 6391068v7

EXHIBIT A

PROJECTIONS

BDDB01 6391068v7

# Van Ham Dairy, L.L.C.

## 14 Month Projections (Unaudited and Estimated)
## November, 2010 – December, 2011

Van Ham Dairy, L.L.C. ("Debtor") currently has approximately 2,200 cows. The Debtor's permit allows for as many as 2,250 cows. However, the Debtor estimates the optimal number of cows is approximately 2,300, and the 14 Month Projections ("Projections") are modeled accordingly.

The Projections have been prepared in connection with Van Ham Dairy, L.L.C.'s Disclosure Statement filed on September 7, 2010 (Docket # 233) (as may be subsequently amended, the "Disclosure Statement") and are based upon unaudited and estimated financial projections. As such, and because the Projections are subject to countless variables, the Debtor and its advisors can make no representation or warranty as to the actual financial performance of Debtor during 2011 and beyond.

In addition to the above, the Projections are informed and limited by the following assumptions:

1.   The Debtor recently culled a significant number of inferior cows, which has given it the ability to raise the milk pounds per cow. The Debtor is projected to produce on average 82 pounds of milk per cow per day during 2011. During the cooler months, the production will run around 83 pounds and decrease during the warmer summer months.

2.   The Debtor does not raise calves, but sells them at approximately $80 for bull calves and $180 for heifer calves. Cull cows have been selling for $500.

3.   In the past several years, the Debtor experienced losses primarily due to conditions that are not expected to be repeated or continued, such as but not limited to:

     a)   Debtor operated at a capacity of 750 cows until a 2008 expansion which allowed Debtor to increase capacity to as many as 2,475 cows;
     b)   The cost of the expansion was higher than budgeted and took longer than expected;
     c)   The price of feed was higher than historical levels; and
     d)   The price of milk was lower than historical levels.

4.   The Debtor has been profitable since November, 2009, both due to the increased number of quality cows and price of milk. At this time, the Debtor is cash flowing after paying the following expenses:

     a)   Principal and interest on the Debtor's operating loan;
     b)   Rent consisting of principal and interest on the FLCA loan to Van Ham Dairy Leasing, L.L.C.;
     c)   Professional and administrative fees incurred with the bankruptcy; and
     d)   Professional fees incurred for a court appointed receiver

5.   The Debtor uses an average cost for book purposes in valuing the cattle. At 12/31/09, the average cost was at $1,990, which is the value cull cows are taken off the books.

The budget assumes the cows will be revalued at $1,310 under Fresh Start accounting. Replacement springers are projected to be purchased at $1,500 and fresh two year olds at $1,575.

6.    Corn silage and haylage are the two feeds purchased seasonally by Debtor and are adjusted for in the accrual to cash basis section of the budget. Corn is budgeted at $4.75 a bushel ($38.00 a ton for corn silage).

7.    The Debtor forecasts little need for capital improvement expenditures over the next few years as the dairy facilities were originally built in 2001 and expanded in 2008.

8.    The Projections assume a plan confirmation date in December, 2010.

BDDB01 6384109v1

# Van Ham Dairy
## 14 Month Projection

| | 2010 Nov | 2010 Dec | 2011 January | 2011 February | 2011 March | 2011 April | 2011 May | 2011 June | 2011 July | 2011 August | 2011 Sept | 2011 Oct | 2011 Nov | 2011 Dec | Total 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total cows - Beginning of month | 2,211 | 2,231 | 2,271 | 2,242 | 2,319 | 2,293 | 2,232 | 2,182 | 2,299 | 2,232 | 2,167 | 2,169 | 2,251 | 2,271 | 2,271 |
| Fresh 2 year olds | 80 | 100 | 30 | | 36 | | 10 | | | | 60 | | 80 | 90 | 306 |
| Fresh 2 year olds - payment plan | | | | 137 | | | 175 | | | | | 140 | | | 452 |
| Cull cows | (50) | (47) | (50) | (50) | (52) | (51) | (50) | (48) | (57) | (55) | (48) | (48) | (50) | (51) | (610) |
| Dead cows | (10) | (13) | (9) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (119) |
| Total cows - End of month | 2,231 | 2,271 | 2,242 | 2,319 | 2,293 | 2,232 | 2,182 | 2,299 | 2,232 | 2,167 | 2,169 | 2,251 | 2,271 | 2,300 | 2,300 |
| Dry cows | 280 | 320 | 260 | 255 | 260 | 290 | 240 | 253 | 260 | 238 | 239 | 248 | 250 | 253 | 253 |
| Hospital cows | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 |
| Lactating cows | 1,916 | 1,916 | 1,947 | 2,029 | 1,998 | 1,907 | 1,907 | 2,011 | 1,937 | 1,894 | 1,895 | 1,968 | 1,986 | 2,012 | 2,012 |
| | | | | | | | | | | | | | | | |
| Cull rate | 32% | 32% | 32% | 32% | 32% | 32% | 32% | 32% | 35% | 35% | 32% | 32% | 32% | 32% | 32% |
| Total cull cows | 60 | 60 | 59 | 60 | 62 | 61 | 60 | 58 | 67 | 65 | 58 | 58 | 60 | 61 | 729 |
| | | | | | | | | | | | | | | | |
| Cows Freshened | 190 | 161 | 221 | 179 | 161 | 165 | 160 | 190 | 180 | 195 | 208 | 181 | 190 | 161 | 2,191 |
| Heifer calves | 80 | 68 | 93 | 75 | 68 | 69 | 67 | 80 | 76 | 82 | 87 | 76 | 80 | 68 | 920 |
| Bull calves | 91 | 77 | 106 | 86 | 77 | 79 | 77 | 91 | 86 | 94 | 100 | 87 | 91 | 77 | 1,052 |
| | | | | | | | | | | | | | | | |
| Pounds per cow per day | 74.5 | 77.5 | 80 | 83 | 83 | 83 | 83 | 82 | 78 | 75 | 79 | 82 | 83 | 83 | 79 |
| Price per cwt | 17.50 | 16.00 | 15.22 | 15.22 | 15.34 | 15.56 | 15.60 | 15.85 | 16.39 | 16.61 | 16.80 | 16.86 | 16.86 | 16.54 | 16.07 |
| Days | 30 | 31 | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 365 |
| Total produced lbs of milk | 4,282,260 | 4,603,190 | 4,828,560 | 4,715,396 | 5,140,854 | 4,748,430 | 4,906,711 | 4,947,060 | 4,683,666 | 4,403,550 | 4,491,150 | 5,002,656 | 4,945,140 | 5,176,876 | 57,990,049 |
| | | | | | | | | | | | | | | | |
| **Projection of revenues** | | | | | | | | | | | | | | | |
| Milk | 749,400 | 736,500 | 734,900 | 717,700 | 788,600 | 738,900 | 765,400 | 784,100 | 767,700 | 731,400 | 754,500 | 843,400 | 833,800 | 856,300 | 9,316,700 |
| Revenue heifer calves | 14,360 | 12,170 | 16,710 | 13,530 | 12,170 | 12,470 | 12,100 | 14,360 | 13,610 | 14,740 | 15,720 | 13,680 | 14,360 | 12,170 | 165,620 |
| Revenue bull calves | 7,300 | 6,180 | 8,490 | 6,870 | 6,180 | 6,340 | 6,140 | 7,300 | 6,910 | 7,490 | 7,990 | 6,950 | 7,300 | 6,180 | 84,140 |
| Revenue cull cows | 25,000 | 23,500 | 25,000 | 25,000 | 26,000 | 25,500 | 25,000 | 24,000 | 28,500 | 27,500 | 24,000 | 24,000 | 25,000 | 25,000 | 305,000 |
| Total Cash Receipts | 796,060 | 778,350 | 785,100 | 763,100 | 832,950 | 783,210 | 808,640 | 829,760 | 816,720 | 781,130 | 802,210 | 888,030 | 880,460 | 900,150 | 9,871,460 |
| | | | | | | | | | | | | | | | |
| **Expenses** | | | | | | | | | | | | | | | |
| Animal Health | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 540,000 |
| Bedding | 3,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 3,000 | 3,000 | 4,000 | 4,000 | 4,000 | 3,000 | 3,000 | 5,000 | 49,000 |
| Breeding/Milk Testing | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 84,000 |
| Culled cow expense | 119,400 | 119,400 | 77,290 | 78,600 | 81,220 | 79,910 | 78,600 | 75,980 | 87,770 | 85,150 | 75,980 | 75,980 | 78,600 | 79,910 | 954,990 |
| Custom Hire | 34,000 | 34,000 | 38,500 | 5,000 | 5,000 | 5,000 | 15,000 | 15,000 | 15,000 | 15,000 | 20,000 | 50,000 | 30,000 | 50,000 | 263,500 |
| Feed | 328,600 | 345,700 | 341,300 | 318,800 | 349,000 | 328,800 | 332,100 | 338,600 | 339,700 | 329,800 | 319,500 | 342,600 | 334,500 | 350,100 | 4,024,800 |
| Fuel | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 17,000 | 17,000 | 6,000 | 17,000 | 17,400 | 6,000 | 6,000 | 6,000 | 116,400 |
| Hauling and trucking | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 84,000 |
| Insurance | 9,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 72,000 |
| Interest - PCA | 15,000 | 15,000 | 21,146 | 20,952 | 20,757 | 20,560 | 20,363 | 20,164 | 19,964 | 19,763 | 19,561 | 19,357 | 19,153 | 18,947 | 240,687 |
| Interest - FLCA | | | 23,750 | 23,659 | 23,568 | 23,477 | 23,385 | 23,293 | 23,200 | 23,107 | 23,014 | 22,920 | 22,826 | 22,732 | 278,932 |
| Wages, labor etc | 78,500 | 101,100 | 80,900 | 73,600 | 80,900 | 98,100 | 80,900 | 78,500 | 101,100 | 80,900 | 98,100 | 80,900 | 78,500 | 101,100 | 1,033,500 |
| Marketing | 8,560 | 9,210 | 9,660 | 9,430 | 10,280 | 9,500 | 9,810 | 9,890 | 8,800 | 8,810 | 8,980 | 10,010 | 9,890 | 10,350 | 115,410 |
| Miscellaneous | 29,906 | 11,100 | 10,612 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 11,100 | 132,712 |
| Professional fees | 5,300 | 25,300 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 |
| Repairs and maintenance | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 192,000 |
| Rent | | 51,370 | | | | | | | | | | | | | |
| Supplies | 15,870 | 16,400 | 16,400 | 14,810 | 16,400 | 15,870 | 16,400 | 15,870 | 15,000 | 16,400 | 15,870 | 16,400 | 15,870 | 16,400 | 191,690 |
| Taxes | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 40,800 |
| Utilities | 13,110 | 13,550 | 13,550 | 12,240 | 13,550 | 13,110 | 13,550 | 13,110 | 15,000 | 13,550 | 13,110 | 13,550 | 13,110 | 13,550 | 160,980 |
| Amortization | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 10,080 |
| Depreciation | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 144,000 |
| | | | | | | | | | | | | | | | |
| Total Expenses | 757,486 | 850,370 | 748,848 | 683,931 | 727,515 | 732,167 | 725,948 | 715,247 | 762,375 | 729,721 | 719,955 | 756,558 | 727,289 | 789,929 | 8,819,482 |
| | | | | | | | | | | | | | | | |
| **Accrual Basis Net Operating Income** | 38,574 | (72,020) | 36,252 | 79,169 | 105,435 | 51,043 | 82,692 | 114,513 | 54,345 | 51,409 | 82,255 | 131,472 | 153,171 | 110,221 | 1,051,978 |

10-33231-rls    Doc 333    FILED 11/16/10    ENTERED 11/16/10 17:32:41    Page 34 of 38

**Van Ham Dairy**
**14 Month Projection**

| | 2010 Nov | 2010 Dec | 2011 January | 2011 February | 2011 March | 2011 April | 2011 May | 2011 June | 2011 July | 2011 August | 2011 Sept | 2011 Oct | 2011 Nov | 2011 Dec | Total 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Restructuring Expenses | 87,000 | 107,000 | 28,000 | 28,750 | 25,000 | 17,875 | | | | | | | | | 99,625 |
| **Accrual Basis Net Income** | (48,426) | (179,020) | 8,252 | 50,419 | 80,435 | 33,168 | 82,692 | 114,513 | 54,345 | 51,409 | 82,255 | 131,472 | 153,171 | 110,221 | 952,353 |
| Plus: Depreciation | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 144,000 |
| Plus: Amortization | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 840 | 10,080 |
| Plus: Cull Cow Expense | 119,400 | 119,400 | 77,290 | 78,600 | 81,220 | 79,910 | 78,600 | 75,980 | 87,770 | 85,150 | 75,980 | 75,980 | 78,600 | 79,910 | 954,990 |
| Less: Cow Replacement Cost | (126,000) | (157,500) | (47,250) | - | (56,700) | - | (15,750) | - | - | - | (94,500) | - | (126,000) | (141,750) | (481,950) |
| Less: Cow Replacement Cost - Payment plan | | | | | | (53,944) | (53,944) | (53,944) | (53,944) | (68,906) | (68,906) | (68,906) | (68,906) | | (491,400) |
| Real estate taxes | 3,400 | 3,400 | 3,400 | (25,600) | 3,400 | 3,400 | (8,400) | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | |
| Corn silage & haylage costs - Accrual | 106,600 | 106,600 | 106,600 | 106,600 | 106,600 | 106,600 | 106,600 | 106,600 | 106,600 | 106,600 | 106,600 | 106,600 | 106,500 | 106,200 | 1,278,700 |
| Corn silage & haylage costs - Cash | (60,600) | (50,300) | (134,800) | (134,800) | (134,800) | (114,900) | (114,900) | (99,900) | (70,700) | (138,700) | (68,000) | (102,800) | (102,800) | (61,600) | (1,278,700) |
| Restructuring fees - Accrual | 87,000 | 107,000 | 28,000 | 28,750 | 25,000 | 17,875 | - | - | - | - | - | - | - | - | 99,625 |
| Restructuring fees - Cash | (52,000) | (57,000) | (113,000) | (51,500) | (35,000) | (14,875) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (20,000) | (13,750) | (398,125) |
| Milk Checks - accrued | (749,400) | (736,500) | (734,900) | (717,700) | (788,600) | (738,900) | (765,400) | (784,100) | (767,700) | (731,400) | (754,500) | (843,400) | (833,800) | (856,300) | (9,316,700) |
| Milk Checks - paid | 803,000 | 761,600 | 734,900 | 717,700 | 788,600 | 738,900 | 765,400 | 784,100 | 767,700 | 731,400 | 754,500 | 843,400 | 833,800 | 856,300 | 9,316,700 |
| Milk Advance | | | | | | | | | | | | | | | - |
| Other expenses | | | | | | | | | | | | | | | - |
| **Cash Basis Net Income** | 95,814 | (69,480) | (58,668) | 65,309 | 82,995 | 70,074 | 62,738 | 134,489 | 115,312 | 26,793 | 24,669 | 133,586 | 36,805 | 95,471 | 789,573 |
| Less: Principal Payments - PCA | (55,000) | (55,000) | (32,104) | (32,298) | (32,493) | (32,690) | (32,887) | (33,086) | (33,286) | (33,487) | (33,689) | (33,893) | (34,097) | (34,303) | (398,313) |
| Less: Principal Payments - FLCA | | | (22,920) | (23,011) | (23,102) | (23,193) | (23,285) | (23,377) | (23,470) | (23,563) | (23,656) | (23,750) | (23,844) | (23,938) | (281,108) |
| Less: Prepetition Vendors | | | | | | (37,000) | | | (37,000) | | | (37,000) | | | (111,000) |
| Less: Capital Expenditures | | | | | | | | | | | | | | | |
| - Pay loader | | | (4,000) | (4,000) | (4,000) | (4,000) | (4,000) | (4,000) | (4,000) | (4,000) | (4,000) | (4,000) | (4,000) | (4,000) | (48,000) |
| - Mixer tractor | | | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (24,000) |
| - Silage wall | | | | | | | | | | | | | | | - |
| - Feed Mixer | | | | | | | | | (4,000) | (4,000) | (4,000) | (4,000) | (4,000) | (4,000) | (24,000) |
| **Net Cash Flow - Month** | 40,814 | (124,480) | (119,692) | 4,000 | 21,400 | (28,809) | 566 | 72,026 | 11,556 | (40,256) | (42,676) | 28,944 | (31,136) | 27,230 | (96,847) |
| **Beginning Cash** | 218,503 | | | | | | | | | | | | | | 134,837 |
| **Cumulative Cash Flow** | 259,317 | 134,837 | 15,145 | 19,145 | 40,545 | 11,736 | 12,303 | 84,329 | 95,885 | 55,629 | 12,953 | 41,896 | 10,760 | 37,990 | 37,990 |

10-33231-rls   Doc 333   FILED 11/16/10   ENTERED 11/16/10 17:32:41   Page 35 of 38

<u>EXHIBIT B</u>

<u>LIQUIDATION ANALYSIS</u>

BDDB01 6391068v7

# Van Ham Dairy, L.L.C
## Hypothetical Liquidation Analysis

This Hypothetical Liquidation Analysis ("Analysis") has been prepared in connection with Van Ham Dairy, L.L.C.'s Disclosure Statement filed on September 7, 2010 (Dock. # 233) (as may be subsequently amended, the "Disclosure Statement"). This Analysis reflects values for which assets might be liquidated in a Chapter 7 bankruptcy case for Van Ham Dairy, L.L.C. ("Debtor") as of December 31, 2010. The purpose of this analysis is to demonstrate potential recoveries to creditors upon a chapter 7 liquidation of the Debtor in comparison to recoveries projected under a reorganization of Debtor.

This Analysis has been prepared assuming that the current Chapter 11 case converts to a Chapter 7 case on December 31, 2010 and assets are promptly liquidated. This Analysis is based upon unaudited book values of assets and liabilities of Debtor as of September 30, 2010 and necessarily relies on balance sheet projections for December 31, 2010.

This Analysis represents estimates of recoveries on each asset and/or classes of assets and also estimates the amount of allowed claims in the case. As such, the Debtor and its advisors can make no representation or warranty as to the actual results of a liquidation of the Debtor.

In addition to the above, the Analysis relies on and is limited by the following assumptions:

1) As of December 31, 2010, Debtor's "Feed Inventory" will consist of corn silage having a fair market value of approximately $1,050,000 and other feed inventory with a fair market value of approximately $144,000.

2) Cow inventory assumes that, as of December 31, 2010, Debtor will own 2,300 cows at an average market value of $1,310/cow.

3) Equipment is valued pursuant to the results of a postpetition appraisal.

4) The Estimated Allowed Claim for secured claims includes the estimated balance of the secured claims of AgStar Financial Services, PCA, CNH Capital and various providers of corn silage pursuant to the Court's August 20, 2010 Order (Docket # 183).

5) Estimated realization rate is an estimate based on the market, the assets and the results of recent liquidations of similarly situated debtors.

6) Wind down and liquidation expenses are estimates based on 11 U.S.C. § 326, costs of auction and other comparable services, attorneys and are informed by the liquidation of other operations of comparable size and complexity.

7) Estimated Allowed Claims are estimates based on Debtor's schedules, filed proofs of claim and outstanding postpetition payables.

BDDB01 6383669v1

**Van Ham Dairy, LLC**
**Liquidation Analysis (as of December 31, 2010)**
**Estimated and Unaudited**

| Assets | Notes | Net Fair Market Value | Estimated Liquidation Value | Estimated Realization Rate |
|---|---|---|---|---|
| Cash & Cash Equivalents | | $ 345,000.00 | $ 345,000.00 | 100% |
| Net Receivables | | $ 545,000.00 | $ 490,500.00 | 90% |
| Feed Inventory | | $ 1,194,000.00 | $ 597,000.00 | 50% |
| Cattle Inventory | | $ 3,013,000.00 | $ 1,807,800.00 | 60% |
| Equipment | | $ 298,000.00 | $ 119,200.00 | 40% |
| **Totals** | | **$ 5,395,000.00** | **$ 3,359,500.00** | |
| Chapter 7 Trustee Fees | | | $ 120,000.00 | |
| Wind-Down Expenses | | | $ 75,000.00 | |
| Professional Fees | | | $ 60,000.00 | |
| | | | **$ 255,000.00** | |
| **Net Proceeds Available to Creditors** | | | **$ 3,104,500.00** | |

| Claims | Estimated Allowed Claim | Estimated Total Paid | Estimated % of Allowed Claim Paid |
|---|---|---|---|
| Secured Claims | $ 4,460,000.00 | $ 3,104,500.00 | 70% |
| Administrative Claims | $ 250,000.00 | $ - | 0% |
| Priority Claims | $ 67,000.00 | $ - | 0% |
| General Unsecured Claims | $ 2,350,000.00 | $ - | 0% |
| **Totals** | **$ 7,127,000.00** | **$ 3,104,500.00** | |

6383507_1.XLSX